ASSOCIATED GENERAL CONTRACTORS OF CALIFORNIA, Lathing and Plastering Contractors Association, San Francisco and San Mateo, Painting and Decorating Contractors Association of San Francisco, Inc., W. G. Thompson, Arntz Brothers, Inc., Arntz Contracting Company, Cahill Construction Co., Christensen & Foster, DeNarde Construction, Engstrum & Nourse, Martinelli Construction, Pacific Company; Williams & Burrows and Frederick Meiswinkel, Inc., Plaintiffs,

v.

SAN FRANCISCO UNIFIED SCHOOL DISTRICT, San Francisco Board of Education, Lee S. Dolson, Samuel Martinez, Mrs. James W. Abrahamson, Z. L. Goosby, Eugene Hopp, John A. Kidder, and Thomas A. Reed, Defendants,

National Association of Minority Contractors, and Minority Contractors Association of Northern California, Inc., Intervenors.

No. C–76–2244 SAW.

United States District Court, N. D. California.

May 17, 1977.

James A. Carter, Carter, Cook, Phillips & Voltz, San Francisco, Cal., James Watson, Cox, Castle, Nicholson & Weekes, Los Angeles, Cal., for plaintiffs.

Donald P. McCullum, Oakland, Cal., H. Leroy Cannon, Legal Advisor, San Francisco Unified Sch. Dist., San Francisco, Cal., for defendants.

Steven V. Bomse, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for intervenors.

## MEMORANDUM AND ORDER

WEIGEL, District Judge.

The plaintiffs fall into two classes: (1) unincorporated associations of general contractors and subcontractors engaged in the building and construction industry in San Francisco and (2) contractors and subcontractors so engaged. None of the plaintiffs is a "nonwhite" owned business. Defendant San Francisco Unified School District (hereafter "District") is a duly organized public body consisting of the public schools in San Francisco. Defendant San Francisco Board of Education (hereafter "Board") is the responsible governing body of the District. Intervenors are two associations of minority contractors, respectively, National Association of Minority Contractors and Minority Contractors' Association of Northern California, Inc.

On March 17, 1977, this Court issued a preliminary injunction preventing the District and the Board from carrying out what was called an Affirmative Action Policy. That so-called policy required that a bidder, in order to be awarded a construction contract as a general contractor, utilize minority owned businesses for no less than twenty-five percent of the base bid amount, or

that the bidder be a minority owned business. The injunction was granted on the sole ground that the evidence had failed to establish that the so-called policy was "the will of the Board established by Board action appropriate to carry out that will."

On March 22, 1977, the Board, voting unanimously, took appropriate action to declare and enforce a new and considerably different Affirmative Action policy. Based upon the adoption of the new Policy, the District and Board now move for dissolution of the preliminary injunction. Plaintiffs, of course, oppose.

At the hearing on the motion, all parties stipulated to this effect: In deciding the matter, the Court should pass upon the new Affirmative Action Policy to the same extent as if plaintiffs were moving to enjoin its enforcement.[1] Accordingly, the Court now considers the new Policy and, in determining whether or not the preliminary injunction should be dissolved, reaches its decision on the same basis as if the issues were generated by plaintiffs' motion for a preliminary injunction against carrying out the new Policy.

The Board action establishing it may be summarized as follows: [2]

The Board found, *inter alia*, that in 1966 the San Francisco Supervisors adopted an ordinance "requiring affirmative action non-discrimination practices in the award of all city contracts" and that, in 1968, the Board adopted the provisions of that ordinance "prohibiting discrimination in the award of contracts for and on behalf of the San Francisco Unified School District." The Board made further findings showing that in 1975 it adopted and implemented a policy requiring a 25% "minority participation in the dollar amount of all contracts" awarded by or on behalf of the Board and that, as a consequence, the percentage of dollar amount awards to minority contractors rose to 33.4% compared with 4.99% during a prior period of over ten years. The Board also found that competent and qualified minority contractors and subcontractors are ready, willing and able to perform school construction contracts.

The Board's findings conclude with a statement to the effect that an effective Affirmative Action Policy requires the Board to act in a manner which will insure the awarding of contracts "to the lowest responsible bidder whose bid is consistent with the affirmative action policy" of the District.

Based upon the foregoing and other findings, the Board's Affirmative Action Policy proceeds to declare its purposes and goals to be these: (A) to assure that competitive nonwhite business participation corresponds with the present availability of nonwhite firms seeking an opportunity to compete for San Francisco School District Construction jobs on the same terms as white business firms; (B) to overcome the historic unwillingness of white business firms to participate in joint business ventures with nonwhite business firms; (C) to assure that the effects of past discrimination against nonwhite firms are not perpetuated by the District's construction program; and (D) to guarantee that the largest possible pool of qualified contracting firms will be available for competitive bidding on District Construction projects.

1. This stipulation was made by the parties and approved by the Court in the interest of expeditious administration of justice. Absent the stipulation, defendants would have been entitled to dissolution of the injunction on the ground that the present policy is, unquestionably, that laid down by the Board. Then, the plaintiffs would have had to have filed a new motion for a preliminary injunction against enforcement of the new policy, and the defendants would have had to have filed their opposition to the new motion. The stipulation enables the Court to decide, without duplicative paperwork by the parties or undue delay, the question as to whether or not a preliminary injunction should be issued against carrying out the new Policy.

2. The entire Policy, contained in five typewritten pages, is appended as Exhibit A. Exhibit A is an exact duplicate, without editing or correction, of the Policy as certified to the Court by the defendant Board and not challenged by plaintiffs as to authenticity. The Court's summary in text is greatly abbreviated.

The Board resolution then lays down the following requirements:

General contractors bidding upon school construction projects over $100,000.00 will be required to employ nonwhite owned businesses for individual contract dollar amounts which total at least 25% of the general contract dollar bid. A general contractor who submits a bid that does not meet the 25% requirement will not be considered a responsible bidder and will not be awarded the bid unless he establishes at a hearing that he has taken every possible measure to comply with the 25% requirement.

If the low monetary bidder is found not to have met the 25% nonwhite owned business participation requirement, he shall be informed and notified of the opportunity for a hearing to rebut any finding of non-compliance and to present evidence on his own behalf.

The Board may award a contract notwithstanding non-compliance "where the Board determines either that the contractor has taken every possible measure to comply, or that it is not practicable in the best interests of the District to require compliance in the specific case."

The Board resolution defines a number of terms including "nonwhite". "[A] nonwhite person is a person whose racial ancestry is one, or a mix, of the following: Black, Asian, Latin American, American Indian, or any native Pacific Island group. A person whose ancestry is a mixture of white and nonwhite will be considered 'nonwhite,' if such ancestry is one-quarter or more nonwhite."

The good faith and good intentions of the Board are not open to question. There is no evidence to suggest that it had any purpose, in laying down the Affirmative Action Policy, other than the laudable one of curbing and correcting racial discrimination which the Board found to have been practiced with respect to nonwhite owned subcontracting businesses. The Board's purpose is manifestly based upon the premise—requisite to the freedoms protected by our Constitution—that there be an end to racial discrimination denying equality of economic opportunity.

Plainly, then, the crucial legal question here presented is not one of purpose. It is one of power.

Does the Board have legal authority to proclaim and carry out the Affirmative Action Policy?

As the law now stands, there is little doubt that the State of California itself could require compliance with an Affirmative Action Policy of the kind here before the Court. The state could also authorize school boards to declare and effectuate such policies. Many decisions confirm the power of state legislatures (and of other governmental bodies authorized to establish public policy) to mandate preferences for racial minorities, when the mandate is based upon proper findings of past discrimination against those minorities. For example, the State of Massachusetts can require a contractor for publicly funded construction work at Boston State College to

"... maintain on his project, which is located in an area in which there are high concentrations of minority group persons, a not less than twenty percent ratio of minority employee man hours to total employee man hours in each job category ...." *Associated General Contractors of Massachusetts, Inc. v. Altshuler,* 490 F.2d 9, 11 (1st Cir. 1973), *cert. denied,* 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974).

The underlying rationale of this and other like decisions is well stated in the First Circuit's opinion written by Chief Judge Coffin. Agreeing with Justice Harlan's famous observation that the United States Constitution is colorblind, Judge Coffin remarked:

It is by now well understood, however, that our society cannot be completely colorblind in the short term if we are to have a colorblind society in the long term. After centuries of viewing through col-

ored lenses, eyes do not quickly adjust when the lenses are removed. Discrimination has a way of perpetuating itself, albeit unintentionally, because the resulting inequalities make new opportunities less accessible. Preferential treatment is one partial prescription to remedy our society's most intransigent and deeply rooted inequalities. 490 F.2d at 16.[3]

To say that the legislature of the State of California (or the people by initiative) could lawfully require conformity to the Affirmative Action Policy or could empower subordinate bodies, such as boards of education, to do so, is not to say that the San Francisco Board of Education has that power. As will be seen, the Board's powers are limited, under the state constitution and statutory enactments, to those closely related to public education and school administration. They do not enable the Board to require building contractors and subcontractors to conform to a social policy declared by the Board, however enlightened and desirable that policy may be.

The powers of the Board derive entirely from the state constitution and a state statute, the California Education Code. They are limited to those matters having a reasonably direct relationship to the operation of schools—matters such as administration, staffing, curricula, textbooks, school building construction and maintenance, rules for admission, disciplinary procedures, etc. See, e. g., Calif.Constit. Art. 9, § 14; Calif. Educ.Code §§ 1051, 15351.

Nevertheless; the Board claims that the state legislature has given it authority to lay down and enforce the Affirmative Action Policy. It is to .be found, the Board contends, in the provisions of California Education Code § 15951 reading as follows:

The governing board of any school district shall let any contracts involving an expenditure of more than five thousand dollars ($5,000) for work to be done or more than eight thousand dollars ($8,000) for materials or supplies to be furnished, sold, or leased to the district, to the *lowest responsible bidder* who shall give such security as the board requires, or else reject all bids. This section applies to all materials and supplies whether patented or otherwise. (Emphasis added.)

In particular, the Board relies upon the word "responsible".

Plaintiffs urge that the quoted section does not sanction the Affirmative Action Policy. The Court agrees.

The manifest purpose of section 15951—clear from its plain language—is to protect the public against corrupt or wasteful expenditure of school funds. Defendants' reliance upon the word "responsible" as authorizing the Board's Affirmative Action Policy calls for transforming section 15951 from one narrowly focusing upon honesty and economy into an enactment of public policy by which the California legislature undertook to redress, or permit school boards to redress, past racial discrimination by contractors dealing with school boards.

**3.** Other cases in accord with *Altshuler* include: *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444, (1976), permitting seniority relief for minorities; *Southern Ill. Builders Ass'n v. Ogilvie*, 471 F.2d 680 (7th Cir. 1972), upholding the Ogilvie Plan for the recruitment, placement and training of minorities in the highway construction industry of southern Illinois; *Contractors Ass'n of E. Pa. v. Secretary of Labor*, 442 F.2d 159, 175 (3d Cir.), *cert. denied*, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971), upholding the Philadelphia Plan which required bidders on construction projects to have an affirmative action policy so as to advance the Plan's goals for minority hiring; *Porcelli v. Titus*, 431 F.2d 1254 (3d Cir. 1970), *cert. denied*, 402 U.S. 944, 91 S.Ct. 1612, 29 L.Ed.2d 112, (1971), holding that the promo-

tion by the Newark Board of Education of black teachers over white teachers, in disregard of a promotional list, was constitutional; *Germann v. Kipp*, 429 F.Supp. 1323, (W.D.Mo., 1977), upholding the promotion of minorities ahead of whites in the Kansas City, Mo., Fire Department; *Joyce v. McCrane*, 320 F.Supp. 1284 (D.N.J.1970), upholding the Newark Plan which set goals for the utilization of minority journeymen on construction projects; *Weiner v. Cuyahoga Community College Dist.*, 19 Ohio St.2d 35, 249 N.E.2d 907 (1969), *cert. denied*, 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970), holding that Cuyahoga Community College District properly rejected the lowest financial bid for a construction project where that bidder failed to assure the District that he would comply with antidiscrimination laws.

No such broad intendment can reasonably be read into the section.

Defendants, arguing to the contrary, rely upon an opinion of the California Attorney General issued in 1963 and upon a 1969 decision of the Supreme Court of Ohio rendered by a divided court.

Upon careful analysis, it will be seen that the Attorney General's opinion (42 Ops. Att'y Gen. 169 (1963)) does not support defendants' contention. The question presented to the Attorney General was whether the Berkeley Unified School District and its Board of Education could include, in school construction contracts, clauses prohibiting builders from engaging in racial and religious discrimination in their employment practices. The Attorney General found that such clauses were "consistent with and in aid of existing statutes". The opinion then proceeded to state that "conformity to the laws prohibiting employment discrimination on public works would appear to be a criterion well within the requirements of being a 'responsible bidder' especially in view of the fact that such laws represent an urgent policy of this state."

The Ohio case, upon which defendants place great reliance, is *Weiner v. Cuyahoga Community College Dist., supra,* note 3. It is not clear from either the majority nor the minority opinion as to precisely what was required by the school board policy in that case. But there again, as is true of the California Attorney General's opinion, the question involved related to the power of the district (a college district in that case) to require a bidder to conform to law. The majority opinion stated:

We conclude that the capacity to assure a performance *which complies with antidiscrimination laws* is reasonably a part of the standard of a best or responsible bidder on a contract involving the expenditure of public funds. 249 N.E.2d at 910 (emphasis added).

It is one thing to say that a bidder is not responsible if he is unwilling to comply with the law. It is quite another to say that the Board can declare a social policy and then categorize a bidder as not responsible within the terms of section 15951 for failing or refusing to comply when that policy transcends the authorized power of the Board. *See Broidrick v. Lindsay,* 39 N.Y.2d 641, 385 N.Y.S.2d 265, 350 N.E.2d 595 (1976).

The most recent, authoritative interpretation of the term "lowest responsible bidder" is to be found in a decision of the California Supreme Court, *City of Inglewood v. Superior Court,* 7 Cal.3d 861, 103 Cal.Rptr. 689, 500 P.2d 601 (1972). After pointing out that trustworthiness, quality, fitness and capacity are included in the term "responsible bidder", the California Supreme Court goes on to say: "Thus, a contract must be awarded to the lowest bidder unless it is found that he is not responsible, i. e., not qualified to do the particular work under consideration." 7 Cal.3d at 867, 103 Cal. Rptr. at 692, 500 P.2d at 604. There is not the slightest hint in *Inglewood* nor any other California case that the term "lowest responsible bidder" is sufficiently broad to justify the construction that a bidder is not responsible if he does not comply with a social policy adopted by the Board without constitutional or statutory authorization.[4]

To repeat, the Affirmative Action Policy of the San Francisco Board of Education serves desirable purposes, but it goes beyond requiring compliance with duly enacted laws. In other words, it is a Board policy which lacks legislative authorization and therefore may not be legally imposed. Defendants must turn to the California legislature or to the California electorate (through the initiative process) for authorization of that policy.[5]

---

4. The term "lowest responsible bidder" has been unchanged since the original enactment of what has become section 15951. 1917 Cal. Stats. c. 552, p. 741. No amendment has affected the meaning of the quoted phrase as used from the beginning.

5. In reaching its decision, the Court has not disregarded the difficult problem faced by the Board when it adopted the Affirmative Action Policy. It had found that nonwhite subcontractors had been discriminated against by general contractors for some ten years. It had further found that a remedy thereafter invoked for a

A Ninth Circuit decision, *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86, 88 (1975), binding upon this Court, lays down the standards governing the issuance of preliminary injunctions. It rules that a plaintiff is entitled to a preliminary injunction upon showing (1) probable success on the merits and (2) the possibility of irreparable injury. In this case, plaintiffs' probable success on the merits is augured because of the Board's lack of authority to lay down the Affirmative Action Policy. And, as to the possibility of irreparable injury, the Board's Affirmative Action Policy must mean in some cases, at least, that white owned subcontractors will be rejected or by-passed in favor of nonwhite owned subcontractors solely because the former are white. It necessarily follows that white owned subcontractors are faced with "the possibility of irreparable injury".

Nothing in this opinion is to be construed as in anywise precluding defendants from requiring, as a condition of bidding, that the bidder must agree to comply with all applicable state and federal antidiscrimination laws, including the Constitution of the United States and that of the State of California.

For all of the foregoing reasons, defendants' motion to dissolve the preliminary injunction is hereby denied.

## EXHIBIT "A"

### FINDINGS AND AFFIRMATIVE ACTION POLICY RELATING TO PARTICIPATION OF MINORITY CONTRACTORS IN SCHOOL CONSTRUCTION PROGRAM AND INTERIM REGULATIONS–1977 (P 3665.1)

This Board of Education of the San Francisco Unified School District finds:

1. That on July 24, 1964, the Board of Supervisors of the City and County of San Francisco adopted Ordinance No. 209–64 based upon findings duly made, among other things, that:

The population of this city and county is composed of people of various racial, religious and ethnic groups. In this city and county, the practice of discrimination on the grounds of race, religion, color, ancestry, or place of birth and the exploitation of prejudice related thereto adversely affects members of minority groups.

Such discriminatory practices are inimical to the public welfare and good order in that they: (1) impede social and economic progress for the entire citizenry by preventing members of minority groups from achieving full development of their individual potentialities and from contributing fully to the cultural and business life of the community; (2) constantly frustrate, degrade and embitter members of minority groups, thereby diminishing their initiative and interest in the community; and (3) tend to create intergroup hostilities and antisocial behavior.

The products of discrimination accumulate continuously; with the result that the social, economic and educational gaps between those suffering discrimination and the majority of the community constantly widen. As a result, mere prohibition of future and present discrimination, while essential, will not reduce the inequalities and disadvantages which a history of discrimination has produced. Accordingly, affirmative remedial action must be initiated, encouraged and coordinated.

2. That on October 10, 1966, the Board of Supervisors of the City and County of San Francisco adopted Ordinance No. 261-

---

year had helped correct the invidious discrimination. On these facts, failure to remedy past discrimination could open the Board to charges that it was tolerating, if not itself participating in, unlawful discrimination. *See Ethridge v. Rhodes,* 268 F.Supp. 83, 88 (S.D.Ohio 1967). But the logic underlying any such charge is more inviting than compelling. It begs the

question of limitation on the Board's power. If the Board lacks the power to require others to correct past racial discrimination, it cannot gain that power simply because it has seen others engage in such discrimination nor because the Board was able to correct it by exceeding the Board's authority.

66, adding Chapter 12B to the San Francisco Administrative Code and requiring affirmative action nondiscrimination practices in the award of all city contracts; and that on January 16, 1968, by Resolution No. 81–16A1, this Board adopted the provisions of said Chapter 12B prohibiting discrimination in the award of contracts for and on behalf of the San Francisco Unified School District.

3. That on January 20, 1970, this Board adopted Resolution No. 01–20A1 authorizing formation of a committee to formulate procedures for an affirmative action program in the awarding of school construction contracts and to secure increased participation of minority contractors in the bidding and awarding of such contracts, and did, on May 19, 1970, by Resolution No. 05–19A1 adopt an affirmative action policy governing the award of school construction contracts and assigning the Superintendent of Schools the responsibility for carrying out said policy.

4. That on December 15, 16 and 17, 1970, the Office of Contract Compliance, Equal Employment Opportunity, United States Department of Labor, held hearings in the City and County of San Francisco for the purpose of determining what action should be taken to ensure equal employment opportunity in the construction industry in San Francisco, California, and, further, to determine the availability and utilization of minority contractors on Federally-involved contracts. It was thereupon found that minority workers have been prevented from fully participating in the construction trades and that utilization of minority subcontractors by contractors could significantly expand the participation of minority craftsmen on projects of federal construction contractors. The San Francisco Plan (41 C.F.R. 60–6), was adopted by the United States Department of Labor setting minimum goals for participation of minorities in federal contracts.

This Board further finds:

1. That during the period commencing January 1964 to and including June 30, 1975, contracts for school construction projects were let and awarded for and on behalf of the School District in the total dollar amount of $87,241,573; that minority contractors and subcontractors participated in the performance of said contracts in the total dollar amount of $2,532,205, representing 4.99 per cent minority contractor participation in the total dollar amount of said contracts; that on or about July 1, 1975, the School District administratively, and pursuant to authority conferred upon the Superintendent aforesaid, adopted and implemented a policy of requiring a minimum of 25 per cent minority participation in the dollar amount of all contracts let or awarded by or on behalf of the School District; that commencing July 1, 1975, to and including October 30, 1976, school construction contracts containing said affirmative action requirement were let and awarded in the total dollar amount of $20,620,788, of which minority contractors participated in the sum of $6,892,264, representing 33.4 per cent of the total dollar amount of said contracts.

2. That there are now, and have been, in the City and County of San Francisco and immediate environs, during all of the times herein mentioned, competent and qualified minority contractors and subcontractors who are now, and have been, ready, willing and able to perform school construction contracts and to participate more fully in the performance thereof; and that the failure of minority contractors and subcontractors to participate more fully in the performance of school construction contracts has resulted primarily from exclusion from participation therein and discrimination based upon race, religion, color, sex or national origin contrary to federal, state and local laws.

3. That the implementation and administration of an affirmative action policy in the award of school construction contracts which will ensure minimum minority participation in the performance of school construction contracts requires that this Board adopt a policy which shall ensure contracts

shall be awarded to the lowest responsible bidder whose bid is consistent with the affirmative action policy of the San Francisco Unified School District herein set forth.

AFFIRMATIVE ACTION POLICY

BUSINESS PARTICIPATION POLICY
OF NONWHITE OWNED
BUSINESSES

## I. *POLICY AND PURPOSE*

The policy of the Board in enacting this Affirmative Action Program, and in setting forth goals therein, is as follows:

A. To assure that competitive nonwhite business participation corresponds with the present availability of nonwhite firms that are seeking a fair and nondiscriminatory opportunity to compete for San Francisco School District construction jobs on the same terms as white business firms;

B. To overcome the historic unwillingness of white business firms to participate in joint business ventures with nonwhite business firms, which joint participation is an integral part of the construction industry;

C. To assure the presently evidenced effects of past discrimination against nonwhite firms within the construction industry is not perpetuated by the construction program of the San Francisco Unified School District;

D. To guarantee the largest possible pool of qualified contracting firms will be available for the competitive bidding upon, and accomplishment of, San Francisco Unified School District Construction Projects.

## II. *AFFIRMATIVE ACTION GOALS*

A. In order to comply with the requirement for being a "responsible bidder" under Education Code Section 15951, general contractors bidding upon school construction projects over $100,000 will be required, under this Program, to employ nonwhite owned businesses for individual contract dollar amounts which total at least 25% of the general contract dollar bid.

A general contractor who submits a bid under this program that does not meet this minimum 25% dollar participation goal will be considered not responsible under Education Code § 15951, and will not be awarded the bid unless the bidder establishes at a hearing that he has taken every possible measure to comply with the 25% dollar participation goal of this program.

B. 1. *Determination of Responsible Bidder.* In the event that the dollar participation goal of paragraph A is not met, the District may consider the bidder as not responsible and not award the contract to him unless the bidder establishes at a public hearing before the Board of Education that he has taken every possible measure to comply with the program.

2. *Opportunity for Hearing.* If the low monetary bidder is found not to have met the 25% nonwhite owned business participation requirement, he shall be informed of such non-compliance and notified of the opportunity to request, within five days after receipt of such notification, a hearing before the Board of Education to rebut any finding of non-compliance and to present evidence on his own behalf.

3. *Discretion of Board.* The Board of Education may award a contract notwithstanding non-compliance with its affirmative action goal where the Board determines either that the contractor has taken every possible measure to comply, or that it is not practicable in the best interests of the District to require compliance in the specific case.

C. In furtherance of this defined policy, "ownership" is defined as follows:

1. The ownership of a thing is the right of one or more persons to possess

and use the thing owned to the exclusion of others. The elements of control in the use of a business and the liability for one's actions in the use of a business are essential to the definition of ownership pursuant to this program which seeks to eliminate discriminatory practices in the construction industry.

2. Excluding sole proprietorships and corporately owned businesses, nonwhite ownership of a business will be calculated as a percentage in direct proportion to the ownership interest the nonwhite person has in the business. This ownership interest will be determined according to the general legal definition of such ownership.

III. Interim Regulations 1977 covering specific types of business formations are hereby passed effective to and including June 30, 1977, pending further study and recommendation by the Superintendent.

## INTERIM REGULATIONS 1977

A. RECOGNIZED BUSINESS OWNERSHIP

1. Partnerships: Partners are owners of the business and "all partners have equal rights in the management and conduct of the partnership's business." (Corp.Code § 15018(e)).

2. Joint Ventures: The resemblance between a partnership and a joint venture is so close that the rights as between adventurers are governed practically by the same rules that govern partners. However, each joint venture agreement will be examined to assure that the intent and purpose of this Program is not subverted by the joint venture agreement.

3. Limited Partnership: The purpose of this Program is to impose a legally enforceable obligation upon the person exercising ownership control of a business, and since limited partners do not take part in control of the business, and are not bound by the obligations of the partnership (Corp. Code § 15501), limited partners are not considered "owners" of the business for purposes of this Program.

4. Corporation: A corporation is a legal person or entity recognized as having an existence separate from that of its shareholders. The corporation, itself, is the "business owner," and for purposes of this Program, a corporate business will be considered to be a nonwhite business if 51% or more shares of its voting stock are held by nonwhite persons.

B. "NONWHITE" Defined

In general, the term "nonwhite" shall be defined in order to carry out the overall purpose of this program which is to guarantee equal business opportunity for those persons historically stigmatized and discriminated against, because of ancestry, by the social policies and racial views of the white majority in this country as a whole.

For purposes of this Program, a nonwhite person is a person whose racial ancestry is one, or a mix, of the following: Black, Asian, Latin American, American Indian, or any native Pacific Island group. A person whose ancestry is a mixture of white and nonwhite will be considered "nonwhite," if such ancestry is one-quarter or more nonwhite.