616 F.2d 1381
 24 Empl. Prac. Dec. P 31,422, 27 Cont.Cas.Fed.
(CCH) 80,416
ASSOCIATED GENERAL CONTRACTORS OF CALIFORNIA, et al.,
Plaintiffs-Appellees,
v.
SAN FRANCISCO UNIFIED SCHOOL DISTRICT; San Francisco Board
of Education, et al., Defendants,
and
National Association of Minority Contractors and Minority
Contractors Association of Northern California,
Intervenors-Appellants.
ASSOCIATED GENERAL CONTRACTORS OF CALIFORNIA, et al.,
Plaintiffs-Appellees,
v.
SAN FRANCISCO UNIFIED SCHOOL DISTRICT; San Francisco Board
of Education, et al., Defendants-Appellants,
and
National Association of Minority Contractors, and Minority
Contractors Association of Northern California, Intervenors.
 Nos. 77-2507, 77-2750, 77-3124 and 77-3764.
 United States Court of Appeals,
Ninth Circuit.
 Feb. 11, 1980.
Rehearing Denied Feb. 22 and April 25, 1980.
 
 Stephen V. Bomse, San Francisco, Cal., for intervenors-appellants.
 H. LeRoy Cannon, San Francisco, Cal., for defendant-appellant.
 James A. Carter, Allan Yannow, San Francisco, Cal., on brief; James P. Watson, Los Angeles, Cal., for plaintiffs-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before CHOY and HUG, Circuit Judges, and RICHEY, District Judge.*
 CHOY, Circuit Judge:
 
 
 1
 Associated General Contractors (AGC) sued to challenge the "affirmative action policy" adopted by the San Francisco Board of Education (Board). Under the policy, bidders for construction contracts let by the San Francisco Unified School District (School District) must be minority general contractors or must utilize minority subcontractors for 25% in dollar volume of the contract work.[1] AGC asserts that this policy violates 42 U.S.C. §§ 1981 and 1983 and the Fourteenth Amendment, and California law as well.
 
 
 2
 The district court held that such a set-aside for minority contractors on public works was illegal, except as to projects funded with federal money given on condition that 10% or more of the money would go to minority contractors. We agree.
 
 I. Statement of the Case
 
 3
 The Board of Education adopted a resolution in March 1977 finding a present need for an affirmative action policy to overcome the effects of past discrimination in the awarding of School District construction subcontracts. The Board then adopted the policy outlined above. It applied to general contractors bidding on all school construction projects worth over $100,000. Relief from the policy was available only when the Board was satisfied that an ineligible contractor had "taken every possible measure to comply" with the policy, or that it was "not practicable in the best interests of the District to require compliance in the specific case."
 
 
 4
 The policy declared that noncomplying contractors were not "responsible bidders" under California Education Code § 15951 (now § 39640). That statute requires school construction contracts to be awarded to the "lowest responsible bidder."
 
 
 5
 The district court enjoined the School District from enforcing the policy, on the ground that "responsibility" under the state law referred only to a bidding contractor's financial and physical ability to do the work. The court forbade the School District to award contracts to other than the "lowest responsible bidder" merely because the lowest bidder was of the wrong parentage and refused to accede to the School District's views on socially desirable subcontracting. Associated General Contractors v. San Francisco Unified School District, 431 F.Supp. 854 (N.D.Cal.1977) (refusing to dissolve preliminary injunction; permanent injunction entered later).
 
 
 6
 At about the same time, the federal government granted the School District $8,000,000 in public works funds under the Public Works Employment Act of 1977, Pub.L.No. 95-28, 42 U.S.C. §§ 6701-6710, which requires that the recipient entity give "satisfactory assurance to the Secretary (of Commerce) that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises," 42 U.S.C. § 6705(f)(2).
 
 
 7
 The Board then adopted a second affirmative action policy, nearly identical to the first (including a minority set-aside of 25%, rather than the federally-required minimum of 10%) except that it applies only to projects financed with Public Works Employment Act funds.
 
 
 8
 AGC applied for a contempt order to vindicate the earlier injunction. The district court dismissed the proceeding without prejudice. However, it issued an order changing the Board's 25% minority participation requirement on federally-aided projects to a 10% requirement. The court then modified its earlier injunction so as not to prohibit the new policy, as altered.
 
 
 9
 The intervening Minority Contractors appeal from the entry of the permanent injunction against the first affirmative action policy; the School District and the Board appeal from the reduction from 25% to 10% of the set-aside in projects funded through the Public Works Employment Act.
 
 II. Issues
 
 10
 This appeal raises five issues: (1) whether the district court had jurisdiction to test under state law the validity of the Board's policy; (2) whether the manner in which the court reduced the set-aside on Public Works Employment Act projects violated due process; (3) whether California Education Code § 39640 prohibits the Board's affirmative action policy; (4) if state law does prohibit it, whether the state law is unconstitutional as applied to do so; and (5) if the affirmative action policy is not prohibited by any valid state law, whether the policy itself violates the Constitution.
 
 A. Jurisdiction
 
 11
 The district court had jurisdiction to enter its injunction and order. AGC's attacks on the set-aside policy based on the Fourteenth Amendment and 42 U.S.C. §§ 1981 and 1983[2] are substantial federal claims so substantial that the Supreme Court has agreed to hear similar claims this term in Fullilove v. Kreps, 584 F.2d 600 (2nd Cir. 1978), cert. granted sub nom. Fullilove v. Kluztnick, 441 U.S. 960, 99 S.Ct. 2403, 60 L.Ed.2d 1064 (1979). Thus 28 U.S.C. § 1331 provided jurisdiction over the federal claims. The district court also had pendent jurisdiction over the state-law question whether the Board had authority under state law to adopt and enforce its affirmative action policy. See Hagans v. Lavine, 415 U.S. 528, 536, 94 S.Ct. 1372, 1378, 39 L.Ed.2d 577 (1974). And, as it did here, the district court could properly deal with the state question first, particularly when that course avoided a very difficult constitutional question (the Fullilove question). See id. at 543, 94 S.Ct. at 1382.
 
 B. Due Process
 
 12
 The School District and the Board are the only parties appealing the district court's downward revision of the minority set-aside in the second affirmative action policy (relating to federally-funded projects). They originally complained that the manner in which this was done deprived them of their due process rights to notice and opportunity to be heard. However, in their reply brief they explicitly "abandoned and dismissed that portion of this appeal which . . . (a)lleges denial of due process on hearing In Re Contempt."
 
 
 13
 Even if we did not hold them to this waiver, we would find no due process violation. The effect of what the district court did was to create an exception to the injunction, not to broaden its coverage. The illegality of a 25% set-aside, to the extent not required by federal law, was law of the case; extensive reargument was not required.
 
 C. Authority Under State Law
 
 14
 The district court held that under state law the affirmative action program was void because the Board had no authority to adopt it. A federal court's role in such a case is to give state laws the construction it believes the highest state court would give them. In this inquiry we give substantial deference to the opinion of a district court sitting in the state. Lewis v. Anderson, 615 F.2d 778, 781 (9th Cir. 1979); Smith v. Sturm, Ruger & Co., 524 F.2d 776, 778 (9th Cir. 1975). We agree with the district court.
 
 
 15
 The authority of school boards in California derives from California Education Code § 35160, which authorizes the adoption of any program that is not in conflict with the purposes for which school districts are established and "is not in conflict with or inconsistent with, or preempted by, any law."Because the Board's affirmative action program conflicts with California Education Code § 39640, we hold that § 35160 does not authorize it. Section 39640, the "low bid law," reads:
 
 
 16
 The governing board of any school district shall let any contracts involving an expenditure of more than eight thousand dollars ($8,000) for work to be done or more than twelve thousand dollars ($12,000) for materials or supplies to be furnished, sold, or leased to the district, to the lowest responsible bidder who shall give such security as the board requires, or else reject all bids. This section applies to all materials and supplies whether patented or otherwise.
 
 
 17
 While no California court has considered the issue whether a school board may adopt a program such as the one at issue here consistent with § 39640, the California Supreme Court has circumscribed the meaning of "lowest responsible bidder" in another context.
 
 
 18
 In Inglewood-Los Angeles County Civic Center Authority v. Superior Court, 7, Cal.3d 861, 500 P.2d 601, 103 Cal.Rptr. 689 (1972), the court held that California Government Code § 25454, a statute requiring that counties award public contracts to the "lowest responsible bidder," did not embody a concept of "relative superiority" which would allow the county to award the contract to the next-to-lowest bidder because he was "more qualified" than the lowest bidder. The court said, "a contract must be awarded to the lowest bidder unless it is found that he is not responsible, i. e., not qualified to do the particular work under consideration." 7 Cal.3d at 867, 500 P.2d at 604, 103 Cal.Rptr. at 692 (emphasis added). Cf. Raymond v. Fresno City Unified School District, 123 Cal.App.2d 626, 267 P.2d 69 (1954) (board could consider poor workmanship on previous job in deciding whether plaintiff was "lowest responsible bidder" under predecessor of § 39640); West v. Oakland, 30 Cal.App. 556, 159 P. 202 (1916) (city could consider "quality, fitness, and capacity to the particular requirements of the proposed work" under a city charter provision requiring public contracts be awarded to "lowest responsible bidder").[3]
 
 
 19
 We do not think that the California Supreme Court would construe the term "lowest responsible bidder" as used in Education Code § 39640 differently from the construction it gave the same language in Inglewood ; the statutes are virtually identical. Therefore, we hold that § 39640 must be construed to prohibit the Board from considering any factor other than the amount of the bid, the minimum qualifications of the bidder as to financial ability and skills to complete the job successfully, and the quality of the bidder's past work.[4]
 
 D. Constitutionality
 
 20
 Appellants argue that if the low bid law prohibits the Board's policy, the law is unconstitutional as applied.
 
 1. Duty of Affirmative Action
 
 21
 a. United States Constitution
 
 
 22
 Appellants boldly claim that the Constitution imposes upon the School District a legal duty to take affirmative action to remedy the effects of past discrimination, and that any state law that prevents such action therefore violates the Supremacy Clause.
 
 
 23
 We think it is useful and necessary to distinguish between the two major types of positive governmental action taken on behalf of minorities.[5] First, there are "reshuffle" programs, in which the state neither gives to nor withholds from anyone any benefits because of that person's group status, but rather ensures that everyone in every group enjoys the same rights in the same place.[6] The most common examples are school desegregation cases and programs.
 
 
 24
 Second, there are "stacked deck" programs, in which the state specifically favors members of minorities in the competition with members of the majority for benefits that the state can give to some citizens but not to all.[7] This category includes affirmative action programs of both the quota and "positive-factor" varieties[8] (but not programs that merely encourage more minority persons to apply for state-conferred benefits).
 
 
 25
 It is well established that the state has an affirmative constitutional duty to use "reshuffle" programs to cure the effects of past or present de jure segregation. Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II ); United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969) (faculty assignment); cf. Dayton Board of Education v. Brinkman, 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977) (no duty to desegregate schools where cause is past de facto segregation). Where such a duty exists, remedies that merely avoid further overt state discrimination are inadequate if they fail to effect an immediate reshuffle. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).
 
 
 26
 On the other hand, there is no constitutional duty to engage in "stacked deck" affirmative action.[9] In our view, the reason for this is that "stacked deck" programs trench on Fourteenth Amendment values in ways that "reshuffle" programs do not. For example:
 
 
 27
 (1) "Stacked deck" programs offer the possibility that the official discrimination is or may become invidious. "Reshuffle" programs are inherently not invidious.
 
 
 28
 (2) In a "stacked deck" operation, a scarce benefit goes to one individual, while another individual is totally deprived of it. "Reshuffle" programs not only provide something to everyone, they provide the same thing (e. g., education in an integrated school) to everyone.
 
 
 29
 (3) In the short run, a "stacked deck" program works wholly to the benefit of certain members of one group, and correspondingly to the harm of certain members of another group. "Reshuffle" programs theoretically provide some benefits also to the whites, for their exposure to the minorities is expected to bring understanding and wisdom. See Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). But "stacked deck" programs do not provide even collateral benefits to the disadvantaged whites.
 
 
 30
 (4) A "stacked deck" program arguably deprives citizens of rights (e. g., the right to make contracts, free from racial discrimination; cf. 42 U.S.C. § 1981), whereas a "reshuffle" program does not (e. g., no "right" to attend a segregated school).
 
 
 31
 It is true that courts, after making judicial findings of past or present discrimination and a need for affirmative action, have sometimes imposed "stacked deck" affirmative action remedies on public bodies for Fourteenth Amendment violations.[10] But the basis for such remedies is the broad powers of equity, not an initial duty of those bodies to have undertaken affirmative action; it is not true that the substance of a post-verdict remedy necessarily was "constitutionally or legally required" before verdict. United States v. Montgomery County Board of Education, 395 U.S. 225, 236, 89 S.Ct. 1670, 1676, 23 L.Ed.2d 263 (1969).
 
 
 32
 No authority impels us to find a constitutional duty to take "stacked deck" affirmative action. If the Supreme Court believed that such a duty existed, it surely would have said so in Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). On the contrary, even the Bakke dissenters admitted that a school "is generally free, as far as the Constitution is concerned, to abjure granting any racial preferences in its admissions program." Id. at 379, 98 S.Ct. at 2794 (Brennan, J., dissenting). Similarly, we think it significant that in all cases in recent years where the permissibility of "stacked deck" programs was sharply attacked, no court has ventured to still all the controversy by proclaiming that not only is such affirmative action permitted, it is actually required by the Constitution.
 
 
 33
 There is no doubt that the enactors of the Fourteenth Amendment did not intend it to require "stacked deck" affirmative action programs. Moreover, it is difficult to understand how the literal guarantee that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws" could require a state to disadvantage one citizen and aid another in their competition for a scarce benefit. And even acknowledging that courts have used the general language of the Fourteenth Amendment to import into it contemporary theories of desirable social policy, we decline to import into the Amendment a "stacked deck" affirmative-action requirement. The pluses and minuses of "stacked deck" programs are far too uncertain and controversial for us to remove the question from the legislative sphere without grossly overstepping the appropriate limits of the judiciary in the American system.
 
 
 34
 Therefore, because no precedent suggests that the Fourteenth Amendment creates a duty to engage in "stacked deck" affirmative action, and no valid reason appears for discovering within the Amendment such a duty, we hold that no such constitutional duty exists.
 
 
 35
 Moreover, even if the argued-for constitutional duty exists, it could not come into play until proper findings were made of discrimination and the need for affirmative action to redress it. Such findings were not and could not be made in this case, as we show infra.
 
 
 36
 b. California Constitution
 
 
 37
 Nor is "stacked deck" affirmative action required by the California Constitution. It is true that Crawford v. Board of Education, 17 Cal.3d 280, 551 P.2d 28, 130 Cal.Rptr. 724 (1976), held that school boards have an affirmative duty under the state constitution to take "reshuffle" affirmative action to alleviate racial segregation in the public schools, regardless of whether its root cause was de facto or de jure segregation or anything else. However, Crawford (1) confined itself to the alleviation of disproportionate minority-student enrollment in public schools; (2) refused to set numerical quotas even in the "reshuffle" desegregation context; and (3) did not authorize "stacked deck" affirmative action in any context. Therefore, there is no reason to think that the California Constitution compels school boards to engage in "stacked deck" affirmative action geared to numerical quotas, especially in areas other than school enrollment.
 
 
 38
 Appellants assert that the affirmative action program is necessary to ensure equal educational opportunities for minority students in vocational work/study programs. While the lack of opportunities in such programs is an educational concern, the availability of post-graduation employment is not. Schools teach; what happens to the graduates is the province of other agencies. "The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 22, 91 S.Ct. 1267, 1279, 28 L.Ed.2d 554 (1971).
 
 
 39
 Besides, if the Board truly were concerned with education, rather than employment, its affirmative action policy would merely compel contractors to offer work experience to all vocational education students, regardless of race. Instead, the policy says nothing about the education or hiring of any minority workers, student or non-student; its concern is that employers be minority. Even if the Board's policy might have the effect of enhancing education opportunities for minority students, we find that the previous inequality was not so great, and the ameliorative effect would not be so pronounced, that the policy is constitutionally compelled.
 
 
 40
 c. Irretractability
 
 
 41
 Appellants argue further that once a program is proven in practice to dispel discrimination, it is unconstitutional to withdraw from it. By this logic, even if the Board was not initially compelled by the Constitution to adopt its affirmative action policy, it is now compelled to continue it.
 
 
 42
 Apparently, the Supreme Court's position is that it is a constitutional violation for a school board to rescind previous action if and only if the board was under a constitutional duty to take the action initially. Dayton Board of Education v. Brinkman, 433 U.S. 406, 414, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977). Because we hold that the Board here had no constitutional duty to adopt its affirmative action policy, the Constitution does not forbid the Board to return to its former race-neutral policy.
 
 
 43
 In support of their argument, appellants cite only Ethridge v. Rhodes, 268 F.Supp. 83 (S.D.Ohio 1967). There the state proposed to withdraw a requirement that contractors sign assurances that they would not discriminate against black workers. Given the state's knowledge that this would result in only whites being hired, the court properly found unconstitutional state action. But in this case no state agency is signalling private parties that they may disregard statutory antidiscrimination laws, so Ethridge is inapposite.[11]
 
 
 44
 Therefore, even though when the Board's affirmative action policy was in effect the percentage of subcontract dollars won by minority firms rose to 33%, we hold that the Board has no constitutional obligation to maintain the policy.[12]
 
 2. Power to Prohibit Affirmative Action
 
 45
 Appellants argue that, even if the affirmative action policy is not constitutionally compelled, the state law prohibiting it is nonetheless unconstitutional.
 
 
 46
 a. Legislative Incompetence Per Se
 
 
 47
 Appellants first argue that voluntary, local affirmative action programs such as the one here are extremely useful tools for eliminating the effects of past discrimination and for raising minorities to a position of economic and sociological equality, and that therefore it is per se unconstitutional for a state to ban them.
 
 
 48
 Whether courts might think that voluntary affirmative action should be a favored policy is of no moment. There is no constitutional duty for the state or the Board to take affirmative action here.[13] This holding would be vitiated if on constitutional grounds we denied the state the power to decide that certain policies outweigh the policy of affirmative action, and to enforce that decision against the agencies it has created. We decline to do so.
 
 
 49
 Appellants' position boils down to an assertion that if a state legislature and a state agency disagree about the wisdom of affirmative action, the agency should prevail (if it is the entity in favor of affirmative action). This we cannot accept. The competent entity in such a situation is always the legislature, whose members are charged with responsibility and accountable to the people for such decisions. The Supreme Court has insisted that "explicit (legislative or Presidential) action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws. Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them." Greene v. McElroy, 360 U.S. 474, 507, 79 S.Ct. 1400, 1419, 3 L.Ed.2d 1377 (1959).
 
 
 50
 "Stacked deck" affirmative action, the constitutionality and wisdom as social policy of which are sharply debatable, is precisely the kind of policy decision in which legislatures have the greatest advantage in competence over local agencies such as school boards. Therefore, we hold that it is constitutionally acceptable for a legislative determination to foreclose, as it does in this case, the Board from voluntarily adopting an affirmative action policy.[14]
 
 
 51
 b. Discriminatory Impact and Intent
 
 
 52
 Even if the low bid law is not unconstitutional per se because it removes the Board's authority under state law to take "stacked deck" affirmative action, it still must be tested under Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).
 
 
 53
 Under Washington, "a law, neutral on its face and serving ends otherwise within the power of government to pursue, is (not) invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another." Id. at 242, 96 S.Ct. at 2049. Even in cases involving so-called discriminatory impact, "the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." Id. at 240, 96 S.Ct. at 2048.
 
 
 54
 The requirement of California Education Code § 39640 that school construction contracts go to the "lowest responsible bidder" obviously is on its face race-neutral.[15] Although the low bid law may have a disproportionate impact on minorities, this is not a case where the disparity of a law's impact "may for all practical purposes demonstrate unconstitutionality because . . . the discrimination is very difficult to explain on nonracial grounds," thus permitting an inference of discriminatory purpose. See 426 U.S. at 242, 96 S.Ct. at 2049. Nor, as we understand it, has the Board itself ever applied (or failed to apply) the low bid law with an invidious intent.
 
 
 55
 Obviously, when the low bid law was passed in 1917, its purpose was not to disadvantage racial minorities. It was designed to protect the public fisc by preventing public officials from awarding contracts uneconomically on the basis of special friendships. Cf. Miller v. McKinnon, 20 Cal.2d 83, 88, 124 P.2d 34, 37-38 (1942) (purpose of competitive bidding on public contracts is to protect taxpayers from corruption and prevent waste of public funds). Such friendships might be based on mutual fondness, bribery, political co-partisanship, racial/ethnic affinity, or any combination of these. It is highly unlikely that minority contractors of that day were in such positions of special friendship; instead, such arrangements harmed the racial outsiders. If anything, the purpose of the low bid law was to help such outsider contractors.
 
 
 56
 Therefore, the low bid law passes the Washington v. Davis test, and must be upheld.
 
 E. Constitutionality of the Policy
 
 57
 Even if the Board's policy was permissible under state law, or if the state law that prohibited the policy was unconstitutional, we would still have to test the policy itself against the standard of the United States Constitution before we could reverse the district court. Because of our disposition of the other issues, we need not reach this one, especially in light of the grant of certiorari to Fullilove v. Kreps, 584 F.2d 600 (2d Cir. 1978), cert. granted sub nom. Fullilove v. Klutznick, 441 U.S. 960, 99 S.Ct. 2403, 60 L.Ed.2d 1064 (1979).
 
 III. Conclusion
 
 58
 The Board lacked authority to adopt its affirmative action policy because the policy was inconsistent with the California low bid law. This application of the low bid law is constitutional.
 
 
 59
 Our opinion of July 16, 1979, slip op. at 2487, is withdrawn.
 
 
 60
 AFFIRMED.
 
 
 
 *
 The Honorable Mary Anne Richey, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 The policy defines as a member of a minority anyone who is not of European or, apparently, of Semitic ancestry. See 431 F.Supp. at 856. There is no special provision for women
 
 
 [2]
 The School District is a political subdivision of the State of California, not of any city or county. Therefore, it clearly is a "person" subject to §§ 1981 and 1983
 
 
 [3]
 Compare Department of General Services v. Superior Court, 85 Cal.App.3d 273, 147 Cal.Rptr. 422 (1978), which involved a special statute exempting certain work on the state capitol from the "lowest responsible bidder" requirement but subjecting it to "competitive bidding." The contract-letting body adopted an affirmative action program much like the one in the present case. The court of appeal vacated summary judgment for the "majority" contractors and remanded for a determination of whether or not proper findings had been made
 
 
 [4]
 In Bakke v. Regents of the Univ. of Calif., 18 Cal.3d 34, 553 P.2d 1152, 132 Cal.Rptr. 680, (1976), aff'd in part and rev'd in part, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the California Supreme Court showed itself unfriendly to quota-type affirmative action programs of state educational bodies. That court recently has narrowly upheld a governmental quota-type affirmative action hiring program, where the minority underrepresentation was due to the government entity's own past discrimination. Price v. Civil Serv. Comm'n, --- Cal.3d ---, 604 P.2d 1365, 161 Cal.Rptr. 475 (1980). Since the School District itself has not been guilty of past discrimination, we think the California Supreme Court would not be inclined to authorize the Board's affirmative action program; instead, we think the court would strictly construe the low bid law, forbidding the program
 We would not deny that under California law a school board may require a bidder to agree not to violate antidiscrimination laws. See 42 Cal.Op.Atty.Gen. 169, 171 (1963). The Board's affirmative action policy is not a state or federal statute, however, but merely represents the Board's beliefs on a controversial social question. Refusal to accede to such beliefs is not a ground, under California law, for exclusion from public contracts. See 57 Cal.Op.Atty.Gen. 574 (1974) (attempt to bar non-union shops from bidding on state printing contracts).
 
 
 [5]
 We do not include in either category those laws which command the state to take no action that discriminates against minorities. E. g., 42 U.S.C. §§ 1981-1983
 
 
 [6]
 E. g., McDaniel v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971) (school desegregation); Zaslawsky v. Board of Education, 610 F.2d 661 (9th Cir. 1979) (teacher assignment); cf. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (legislative reapportionment required by "one person, one vote" standard)
 
 
 [7]
 We use the term "stacked deck" to connote that one contestant has been given a better-than-equal chance to win. We do not intend by the use of this term to suggest that all such programs are bad or illegal. It might well be permissible for the state to stack the deck when one player is a novice taking on an expert, or when one player has only a few chips because the deck has been stacked in favor of his opponent for years. On the other hand, even if one stacks the deck for reasons that are virtuous, remedial, or beneficial in the long run, one cannot analyze the situation without admitting the reality that the deck is now stacked
 The term "reshuffle" suggests both the physical interposition of the various cards, and the creation of equality of opportunity for the players by the elimination of an unfair stack.
 
 
 [8]
 See, e. g., Regents of the Univ. of Calif. v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), which struck down a program that limited whites to 84% or fewer of the positions in a medical school class, but approved a program that made a minority applicant's race one of several positive factors that could be considered in the admissions process
 
 
 [9]
 To the extent that the Sixth Circuit has relied on "reshuffle" cases to find a constitutional duty of states to take "stacked deck" affirmative action to eliminate the effects of past discrimination, see Detroit Police Officers' Assn. v. Young, 608 F.2d 671, 691 (6th Cir. 1979), petition for cert. filed, --- U.S. ---, 48 U.S.L.W. 3558 (U.S. Jan. 10, 1980) (No. 79-1080), we disagree
 Some cases uphold or impose "stacked deck" affirmative action under federal statutes such as Title VII of the Civil Rights Act of 1964 and the Public Works Employment Act of 1977; these cases are irrelevant to our discussion of constitutional duty.
 We also think that United Jewish Organizations v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), is not adverse to our position. There, the Court upheld election redistricting, undertaken to satisfy the Voting Rights Act of 1965, that deliberately split a Hasidic Jewish community between two districts so as to assure uniform nonwhite majorities in both districts. Although no Justice's opinion commanded a majority of the Court, it is clear that the redistricting took race into account, was intended to help nonwhites, and had the effect of disadvantaging the "discrete and insular" Hasidim. However, close examination proves that this was just another "reshuffle" case, because no individual Hasid was placed in a district that violated the one-person-one-vote rule, and the petitioners denied that there was a right to maintain permanently in a single district the community's bloc voting power, id. at 154 n.14, 97 S.Ct. at 1004 n.14. It is well established that competent agencies may take race into account in "reshuffle" contexts.
 
 
 [10]
 E. g., Morrow v. Crisler, 491 F.2d 1053 (5th Cir.) (en banc) (highway patrolmen), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); Bridgeport Guardians, Inc. v. Bridgeport Civil Serv. Comm'n, 482 F.2d 1333 (2d Cir. 1973) (police); Pennsylvania v. O'Neill, 473 F.2d 1029 (3rd Cir. 1973) (en banc: equally divided court) (police); Carter v. Gallagher, 452 F.2d 315 (8th Cir.) (en banc) (firemen), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972)
 Note that these cases involve police, fire, and highway patrol departments, that cannot perform effectively unless the public accords them cooperation and goodwill. Cooperation is unlikely if the public views them as symbols of discrimination. Thus, there is an interest in the immediate and visible integration of those departments.
 However, there is no special functional value in a physical show of integration in this case, which involves the ownership of subcontracting firms on school construction projects.
 
 
 [11]
 Similarly, state constitutional provisions that have the effect of repealing fair housing statutes are prohibited by the United States Constitution because they are tantamount to state encouragement of private discrimination. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969) (municipal equivalents). But here, the state retains many laws forbidding private discrimination against minority subcontractors and generals, so to withdraw the affirmative action policy would not be to encourage discrimination. Also, in Reitman and Hunter the Supreme Court was concerned that antidiscrimination statutes were being supplanted by prodiscrimination constitutional provisions, which expressed the basic policy of the state and could not be repealed as easily as statutes could. This factor is not present here
 
 
 [12]
 The same result obtains under the California Constitution. In Santa Barbara School Dist. v. Superior Court, 13 Cal.3d 315, 530 P.2d 605, 118 Cal.Rptr. 637 (1975), the California Supreme Court upheld the repeal by initiative of specific "racial balance" quotas for public schools, on the ground that the Constitution required only nonsegregation, rather than any numerical quota. Thus the quotas could be repealed even if they had resulted in achieving the racial ratios that they dictated
 
 
 [13]
 The cases seem to indicate that state statutes forbidding public bodies to do something are unconstitutional per se only if the bodies had an affirmative constitutional duty which cannot be effectively fulfilled because of the statute. Thus, state statutes prohibiting busing are unconstitutional only because they remove from school boards the sole or most effective way to fulfill their duty to desegregate the schools via "reshuffle" affirmative action. See North Carolina State Bd. of Educ. v. Swann, 402 U.S. 43, 45-46, 91 S.Ct. 1284, 1285-1286, 28 L.Ed.2d 586 (1971); San Francisco Unified School Dist. v. Johnson, 3 Cal.3d 937, 955, 479 P.2d 669, 680, 92 Cal.Rptr. 309, 320, cert. denied, 401 U.S. 1012, 91 S.Ct. 1266, 28 L.Ed.2d 549 (1971)
 
 
 [14]
 Moreover, the contrary legislative determination fatally undermines the propriety of the Board's findings in support of its affirmative action policy. However, the Supreme Court has held that quota-type affirmative action is unconstitutional where not supported by "appropriate findings . . . made by judicial, legislative, or administrative bodies with competence to act." Regents of the Univ. of Calif. v. Bakke, 438 U.S. 265, 325, 98 S.Ct. 2733, 2766, 57 L.Ed.2d 750 (Brennan, J., dissenting); accord, id. at 307, 98 S.Ct. at 2757 (opinion of Powell, J.). See also id. at 421, 98 S.Ct. at 2815 (Stevens, J., concurring in the judgment) (interpreting the federal legislative determination, Title VI, to prohibit the University's voluntary affirmative action program). The Board's own (disqualified) findings are the only ones supporting its policy. Therefore, the low bid law effectively destroys the Board's constitutional as well as statutory authority to adopt an affirmative action policy
 
 
 [15]
 We need not decide whether a statute explicitly singling out and prohibiting affirmative action programs would be facially neutral or would fall under the doctrine of Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969)