liKIMBALL, Justice.*
THE ISSUE
The Louisiana Minority and Women’s Business Enterprise Act, La.R.S. 39:1951 et seq., enacted by Act 653, Section 1 in 1984 and later amended and reenacted by Act 797, Section 2 in 1992, [hereinafter “the Act”] was declared unconstitutional by a trial court under Art. I, Sec. 3 of the Louisiana Constitution of 1974. Pursuant to La. Const. Art. V, Sec. 5(D), the defendants were entitled to a direct appeal to this court. Upon extensive review of the law and the record in this case, we affirm the trial court’s conclusion that portions of the Act unconstitutionally discriminate on the basis of race. We additionally affirm his finding that the remaining portions of the Act are not severable because the unconstitutional portions of the Act are so interrelated and connected with the remaining parts that they cannot be separated without destroying the intent of the legislature in enacting the Act. Therefore, we affirm the trial judge’s declaration that the Act is unconstitutional in its entirety.
IzTHE ACT
The Louisiana Minority and Women’s Business Enterprise Act was created by the legislature to:
provide the maximum practical opportunity for increased participation by the broadest number of minority-owned businesses in public works and the increased participation by minority-owned businesses and women’s business enterprises in the process by which goods and services are procured by state agencies and educational institutions from the private sector. This purpose will be accomplished by encouraging the full use of the broadest number of existing minority-owned businesses and women’s business enterprises into the marketplace and the entry of new and diversified minority-owned businesses and women’s business enterprises into the marketplace.
La.R.S. 39:1951.
Generally, the Act requires that a certain percentage of funds expected to be expended on public works and procurement contracts be designated solely for participation by “certified” minority business enterprises and women’s business enterprises. La.R.S. 13:1955. The percentage applicable to each state agency is set each year by the Executive Director of the Division of Minority and Women’s Business Enterprise, an entity created by this Act, with the concurrence of the Commissioner of Administration, and cannot exceed 10% for minority business enterprises and 2% for women’s business enterprises. Id. Each agency “shall” file a yearly plan showing its strategy to set aside contracts sufficient to meet its required percentages and quarterly reports indicating compliance with the set goals and the yearly plan. La. R.S. 33:1956.A and B. If the agency fails or declines to formulate a plan, the governor, through the Division of Administration, “shall formulate a plan for that state agency or educational institution.” La.R.S. 33:1956.C. The Act is mandatory on each state agency, and applies to all public works contracts and all contracts for the procurement of goods and services by state agencies and educational institutions. La.R.S. 39:1954. Each agency “shall” comply with the overall annual participation goals established for the individual agency under the Act. Id. If the Division fails to establish and enforce the participation goals, any person aggrieved by this inaction may “seek judicial relief by a *1189 ■writ of mandamus or by injunction.” La.R.S. 39:1968.
In order to meet the goals set for participation by minority and women’s business enterprises, the agencies set aside public works or procurement contracts solely for bidding by certified business enterprises. Additionally, the Act mandates that “preferences” be used in certain limited situations. One example is where a contract for the construction of public works |⅞⅛ to be awarded by the facility planning and control section of the Division of Administration and the amount of the contract is $200,000 or more. In such cases, the award “shall be made to a minority-owned business ... when the price bid by such business is within five percent of the otherwise lowest responsive and responsible bidder” and where the minority business enterprise agrees to adjust its bid to that of the lowest bidder, as long as the minority business enterprise’s original bid was within 5% of that bid. Contracts awarded under this provision to minority business enterprises shall not exceed 10% of the total dollar amount of the contracts awarded that year. La.R.S. 39:1962.[1]
In sum, the Act mandates that state agencies employ a system of set-asides and preferences with regard to procurement and public works contracts from which only certified minority business enterprises and women’s business enterprises benefit.[2] Specifically, a “minority business enterprise” is defined in the Act as a small business which is at least 51% owned by one or more minority individuals who also control and operate the business. La.R.S. 39:1952(15). A “minority” is defined as:
... a citizen of the United States residing in Louisiana and who is:
(a) Black: having origins in any of the black racial groups of Africa.
(b) Hispanic: of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish or Portuguese culture or origin regardless of race.
(e) Asian American: having origin in any of the original peoples of the Par East, Southeast Asia, the Indian subcontinent, or the Pacific Islands.
(d) American Indian or Alaskan Native: having origins in any of the original peoples of North America.
La.R.S. 39:1952(14).
Therefore, while certified minority businesses are able to bid on approximately 100% of the public works and procurement contracts let by the state, non-minority businesses are only able to bid equally on approximately 90% of such contracts put out to bid by state agencies.
FACTS AND PROCEDURAL HISTORY
Uln August of 1994, the Louisiana Health Care Authority (LHCA) published an advertisement for bids for a capital renovation project to renovate the Perdido Clinic of University Hospital in New Orleans, Louisiana. The project was designated in the ad as a minority set-aside project in accordance with La.R.S. 39:1951 et seq., such that only minority business enterprise contractors could bid on the project. Bids were to be received on or before August 17,1994.
On August 15, 1994, plaintiff Louisiana Associated General Contractors, Inc. (LAGC) filed a “Petition for Declaratory and Injunc-tive Relief” which sought (1) to enjoin the receipt and acceptance of bids by the LHCA for the Perdido project and to enjoin any further enforcement of the Act, and (2) to have the Act declared unconstitutional in that it discriminated on the basis of race in violation of La. Const. Art. I, Sec. 3. Various state entities and officers were made defendants, and the Attorney General was properly served.
On August 16,1994, the trial court issued a temporary restraining order restraining the LHCA from continuing to treat the Perdido project as a minority set-aside project and from awarding any other public works con *1190 tracts as set-aside projects under the Act. On August 18,1994, the LHCA withdrew the pending Perdido bid request and re-bid the project without the minority set-aside designation.
On August 22,1994, the minute entries and exhibits reveal defendants stipulated in open court that LHCA plans to set aside future contracts under the Act. The stipulation stated in part: “Although withdrawing the minority set-aside designation for the Project, the LHCA plans on issuing future minority set-aside designated Invitations for Bid under R.S. 39:1951 et seq.” Attached as an exhibit to the stipulation was a letter from Dr. William A. Cherry, the chief executive officer of the LHCA, to Raymond LaBorde, the Commissioner of Administration, indicating the LHCA believed the Act to be constitutional and planned on issuing future minority set-aside designated Invitations for Bid. The LAGC thereafter filed a supplemental and amending petition alleging that because the LHCA had indicated its intent to set aside future contracts for minority bidding only, the LAGC was reiterating its previous request for declaratory and injunctive relief. Defendants answered, wherein they admitted their prior open court stipulation to set aside future projects and the existence of the letter written by Dr. Cherry. Defendants additionally filed a Motion to Dismiss on Grounds of Mootness, which was later [¡¡denied, on the ground that the case was moot due to the cancellation of the minority designated bid solicitation in the Perdido project.
Thereafter, plaintiff filed a motion for summary judgment. The trial court granted the motion, finding that those portions of the Act which denied the opportunity to bid or granted bidding preferences based on race were unconstitutional. He additionally held the remaining portions of the Act were so interrelated that they were not severable. Therefore, he declared the entire Minority Business Enterprise Act to be an unconstitutional violation of Art. I, Sec. 3 and permanently enjoined defendants from any implementation or enforcement of the Act. Pursuant to La. Const. Art. V, Sec. 5(D), because a law of this state had been declared unconstitutional, the defendants were entitled to a direct appeal to this court.
ANALYSIS
Standing and Mootness
Before we turn to an analysis of La. Const. Art. I, Sec. 3, this court, as a threshold issue, must determine whether the LAGC has standing to bring this action and whether the ease presents a justiciable controversy or is moot. It is argued the LAGC does not have standing to bring this action as there has been no injury to the association itself caused by the operation of this Act. This argument raises the issue of organizational or associational standing, previously addressed by this court in Louisiana Hotel-Motel Association, Inc. v. Parish of East Baton Rouge, 385 So.2d 1193 (La.1980). In that ease, the Louisiana Restaurant Association Inc., the Baton Rouge Hotel-Motel Association and the Baton Rouge Chapter of the Louisiana Restaurant Association filed a suit seeking a declaration that a certain Baton Rouge ordinance providing for a six month moratorium on the issuance of licenses to sell or distribute liquor was unconstitutional. Defendant filed an exception of no right and no cause of action, arguing the plaintiff associations lacked standing to bring the suit. In resolving this issue, this court adopted the three-part test for associational standing set forth by the United States Supreme Court in Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).
In Hunt, the Supreme Court held an association will have standing to bring a suit solely on behalf of its members and in the absence of injury to itself when:
(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization’s purpose; and (c) ^neither the claim asserted nor the relief requested requires the participation of individual members of the lawsuit.
Hunt, 432 U.S. at 343, 97 S.Ct. at 2441.[3]
*1191 Applying Hunt to the facts of the case before us, this court in Louisiana Hotel-Motel found the plaintiffs had failed to meet parts (a) and (b) of the Hunt test. Specifically, plaintiffs had made no allegation any of its members had ever applied for or intended to apply for licenses or that the ordinance would prohibit them from doing so, and plaintiffs failed to show the purposes of the organizations were germane to the interests it sought to protect.[4]
In the instant case, the interests the LAGC seeks to protect through the filing of this suit are germane to its purposes. Plaintiffs petition alleges the LAGC is a statewide association of construction contractors which exists for the purposes of protecting and promoting the common interests of its member contractors. One of its objectives is .to establish and maintain fair and open non-diseriminatory competitive bidding practices for public works projects. The LAGC alleges in its petition that LAGC members regularly submit bids to perform work for the state, intend to submit bids in the future, are qualified to bid on all projects, but will be denied the right to bid on or compete equally for certain projects solely on the basis of race. In fact, in a previous case, we have recognized the “LAGC is keenly interested in maintaining the integrity of the public bid process in Louisiana,” and we additionally noted therein that because the LAGC receives dues from each of its members based on contracts entered into by the contractor members, “the deprivation of contracts and profits from its members would divest the LAGC of member dues” to its detriment. Louisiana Associated General Contractors v. Calcasieu, 586 7So.2d 1354, 1358-59 (La.1991). Because the intent of this suit is to challenge a public bid law as being unconstitutionally discriminatory, it appears the interests LAGC seeks to protect through the filing of the suit are germane to its organizational purposes. Additionally, because the suit merely seeks injunctive and declaratory relief, as opposed to monetary damages on behalf of individual contractors, neither the claim asserted nor the relief requested require the participation of individual members in the lawsuit.
In order to bring a suit on behalf of its members, under Louisiana Hotel-Motel and Hunt, supra, it must also be shown the individual members of the LAGC would have standing to sue in their own right. In order to resolve this issue, we must look at the nature of the action asserted by the LAGC. Under La.Code Civ.Proe. art. 1872, “[a] person ... whose rights, status, or other legal relations are affected by a statute ... may have determined any question of construction or validity arising under the ... statute ... and obtain a declaration of rights, status, or other legal relations thereunder.” The purpose of a declaratory judgment action is to “settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations.” La.Code Civ. Proc. art. 1881. “[A] person is entitled to relief by declaratory judgment when his rights are uncertain or disputed in an immediate and genuine situation and the declaratory judgment will remove the uncertainty or terminate the dispute.” In Re P.V.W., 424 So.2d 1015, 1020-21 n. 10 (La.1982). Although the codal articles on declaratory judgment are to be “liberally construed and administered,” *1192 “[t]he court may refuse to render a declaratory judgment or decree where such judgment or decree, if rendered, would not terminate the uncertainty or controversy giving rise to the proceeding;” and, as with any other action, a suit “can be brought only by a person having a real and actual interest which he asserts.” La.Code Civ.Proc. arts. 1881, 1876 and 681. See also Louisiana Associated General Contractors v. Calcasieu, supra, 586 So.2d at 1358 (To bring a declaratory judgment action challenging a school board rule having to do with its bidding process, plaintiff association need only show a “real and actual interest” in the action.).
It is argued the individual members of the LAGC, and by extension the LAGC, do not have standing to sue individually because there is no longer a bid in dispute. In Louisiana Independent Auto Dealers Association v. State, 295 So.2d 796, 799 n. 1 (La.1974), this court recognized that federal decisions on standing and justiciability “should be considered persuasive” Isby this court. Article III of the United States Constitution limits the federal judicial power to only “eases and controversies.” There is no comparable limitation found in the Louisiana Constitution. Rather, our requirement of a justiciable controversy and its concomitant prohibition of advisory opinions arises from jurisprudence and the various procedural laws which apply depending on the type of action brought. Regardless of the source of the restriction, however, both jurisdictions require that the court decide only justiciable controversies. Therefore, federal eases are at the very least persuasive, and standing and justiciability thereunder may in fact be more restrictive due to the fact the federal court limitation is found in a constitution as opposed to the jurisprudence.
In a case entirely on point, Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville, Florida, 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993), an association of contrae-tors brought a declaratory judgment action challenging the constitutionality under the Fourteenth Amendment of a Jacksonville minority business set-aside program. There was no particular bid under dispute. In addressing the issue of whether the association had standing to bring the action, the Court discussed whether the association had alleged a concrete, and not merely hypothetical, “injury in fact” or invasion of its legally protected interests. The Court held the plaintiff was not required to show there was a particular bid at issue or that it would have been successful at making the lowest bid on any particular contract but for the operation of the ordinance. Instead, the mere erection of the racial barrier was sufficient injury in itself.
When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The “injury in fact” in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit_ And in the context of a challenge to a set-aside program, the “injury in fact” is the inability to compete on an equal footing in the bidding process, not the loss of a contract. To establish standing, therefore, a party challenging a set-aside program like Jacksonville’s need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis.
508 U.S. at-, 113 S.Ct. at 2303 (citations omitted) (quotations omitted) (footnote omitted).[5]
_]gln the instant case, the same can be said for the individual members of the LAGC. *1193 They have a real and actual interest in the case despite the fact the Perdido Project was rebid without the minority designation. A determination of the constitutionality of the Act would terminate the controversy. The position of the LAGC as to the constitutionality of the Act is adverse to the position of the state. Both sides of the dispute have a significant interest in achieving a successful resolution of the case. LAGC’s members have been injured by a law which facially establishes a racial barrier which has prohibited them and will prohibit them from bidding on contracts on an equal basis. The rights and status of the individual members of the LAGC have been affected by the .Act.[6] Therefore, because the three-part Hunt test as well as the requirements of the declaratory judgment articles are met in this case, the LAGC has standing to bring this declaratory judgment action as long as there is a justicia-ble controversy and the case is not moot.[7]
It is argued the case is moot and/or a justiciable controversy is lacking because the Perdido Project was rebid without a minority set-aside designation. It is well settled that courts will not decide abstract, hypothetical or moot controversies, or render advisory opinions with respect to such controversies. In order to avoid deciding abstract, hypothetical or moot questions, courts require cases submitted for adjudication be justiciable, ripe for decision and not brought prematurely. St. Charles Parish School Board v. GAF Corporation, et al., 512 So.2d 1165 (La.1987).
A “justiciable controversy” is defined as an “existing actual and substantial dispute, as distinguished from one that is merely hypothetical or abstract [or moot], and a dispute which involves the legal relations of the parties who have real adverse interest, and upon which the | ^judgment of the court may effectively operate through a degree of conclusive character.” St. Charles Parish School Board, supra, 512 So.2d at 1171. See also St. Charles Gaming Company, Inc. v. Riverboat Gaming Commission, et al., 648 So.2d 1310 (La.1995). In terms of a declaratory judgment action, “justiciable controversy” has been explained by this court previously in Abbott v. Parker, 259 La. 279, 249 So.2d 908, 918 (1971).
A “justiciable controversy” connotes, in the present sense, an existing actual and substantial dispute, as distinguished from one that is merely hypothetical or abstract, and a dispute which involves the legal relations of the parties who have real adverse interests, and upon which the judgment of the court may effectively operate through a decree of a conclusive character. Further, the plaintiff should have a legally protecta-ble and tangible interest at stake, and the dispute presented should be of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.
“A court must refuse to entertain an action for a declaration of rights if the issue presented is academic, theoretical, or based on a contingency which may or may not arise.” American Waste v. Martin Parish, 627 So.2d 158,162 (La.1993).
A “moot” question connotes an issue that has been deprived of practical significance and made abstract or purely academic. American Waste, supra. A “moot” case is one in which a judgment can serve no useful purpose and give no practical relief; Robin v. Concerned Citizens for Better Education in St. Bernard, Inc., 384 So.2d 405 (La.1980); and when “there is no reasonable expectation that the alleged violation will recur and when interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.” Khosravanipour v. Department of Transportation and Development, 644 So.2d 823, 826 (La.App. 1st Cir.1994), writ denied, 94-2729 (La.1/6/95), 648 So.2d 930. The United States Supreme Court defines “mootness” in the same terms. See, *1194 e.g., County of Los Angeles v. Davis, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). According to Rotunda and Nowak, Treatise on Constitutional Law, Vol. 1, § 2.13 (emphasis added), a case may become moot for several reasons:
The controversy must normally exist at every stage of the proceeding, including the appellate stages. Thus, a case may become moot because the law has changed; because defendant has paid moneys owed and no longer wishes to appeal, notwithstanding plaintiffs desire to obtain a higher court ruling; because allegedly wrongful behavior has passed, been mooted, and could not reasonably be expected to recur; because a party could no longer be affected by a challenged statute; for example, a law regulating rights of minors when the party, through lapse of time, is no longer within the age brackets governed by the statute; or because a party has died.
In Northeastern Florida Chapter of Associated General Contractors of America, supra, | nthe case involving a challenge by a contractors’ association to a Jacksonville minority business set-aside program, the city repealed its challenged ordinance after the United States Supreme Court granted certio-rari in the ease and replaced it with a similar ordinance which continued to contain a provision setting aside contracts for exclusive competition by blacks and women only. Defendants argued the repeal of the previously challenged law rendered the case moot. The Court cited a “well settled” rule that “a defendant’s voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice,” and referred to its earlier case of City of Mesquite v. Aladdin’s Castle, Inc., 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). In City of Mesquite, plaintiff had challenged a city ordinance as unconstitutionally vague. After the Supreme Court noted probable jurisdiction, the city amended the ordinance to eliminate the controversial wording. The Court found the case was not moot, however.
It is well settled that a defendant’s voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.... In this case the city’s repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court’s judgment were vacated.
Mesquite, 455 U.S. at 289, 102 S.Ct. at 1074-75.
Applying Mesquite and its progenitors to the Northeastern case, the Supreme Court held the case was not moot, as there existed a justiciable controversy since Jacksonville had in fact reenacted an unconstitutionally questionable ordinance. See also Blanchette v. Connecticut General Ins. Corporations, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) where, because the law in question mandated a challenged action to occur, plaintiffs’ case was not moot since a violation of plaintiffs’ constitutional rights was “in no way hypothetical or speculative. Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect.” Id. at 143, 95 S.Ct. at 358. This restriction on a finding of mootness is also discussed in Rotunda and Nowak, Treatise on Constitutional Law, Vol. 1, § 2.13. “[I]f a defendant voluntarily stops allegedly illegal conduct, that change does not make the case moot, for the defendant would then be free to return to his old ways. Defendant, in such a case, must show that ‘there is no reasonable expectation that the wrong will be repeated.’ ”[8]
| igAn exception to the general rule that voluntary cessation of allegedly illegal conduct does not make a case moot is where it can be said with assurance there is no reasonable expectation the alleged violation will recur, and interim relief or events have completely and irrevocably eradicated the ef *1195 fects of the alleged violation. When both conditions are satisfied it may be said that the case is moot despite the fact the defendant voluntarily stopped his illegal conduct, because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law. County of Los Angeles, supra, 440 U.S. at 631, 99 S.Ct. at 1383.
The instant case is easily distinguishable from previous cases by this court wherein we found various actions were moot or lacked a justiciable controversy. As pointed out by the United States Supreme Court in Northeastern, the injury to the LAGC, in its role of representing its individual members, is not in its inability to bid on any particular public works contract but rather in the establishment itself of a barrier which prohibits members of a certain race from bidding equally on public contracts. It was irrelevant in that case that there was or was not the existence of a particular contract set aside for minority bidding. There is an actual and substantial dispute over the constitutionality of the racially based set-asides and preferences created by the Act. A judgment by this court will conclusively decide whether the Act can continue to operate as written. The fact that a particular bid designated for exclusive minority bidding has been rescinded does not render this case moot as the Act which sets up a facially racially discriminatory barrier continues to cause injury to plaintiffs by its mere existence.
More importantly, however, although a particular bid is no longer at issue, the LHCA intends to designate future contracts under the Act. This case is not based on a hypothetical or theoretical contingency which may or may not arise. There is not only a reasonable expectation the alleged violation will recur, but there is an absolute certainty the allegedly unconstitutional conduct will recur. In a joint stipulation, the LHCA admits it intends to designate future contracts solely for minority bidding. A letter by the director of the LHCA made part of this record says the same. In addition and most importantly, the Act is mandatory on all state agencies, and, the Division, if it fails to implement and enforce the Act, is subject to a mandamus action under La.R.S. 39:1968. Therefore, defendant’s voluntary "withdrawal of the | isset-aside designation from the Perdi-do Project does not deprive this court of its power to determine the constitutionality of the Act itself. The withdrawal of the set-aside designation on this particular project does not preclude the LHCA, or any other state agency for that matter, from designating future contracts for minority bidding only. In fact, the LHCA has stipulated it will do so.
For the foregoing reasons, the LAGC has standing to bring this declaratory judgment action on behalf of its individual members, and this case presents a justiciable controversy which is not moot. We turn now to the meaning and operation of La. Const. Art. I, See. 3.
Article I, Section 3 of the Louisiana Constitution
Louisiana Const. Art. I, Sec. 3 provides:
No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime.[9]
The Fourteenth Amendment to the United States Constitution, on the other hand, provides only the following with respect to equal protection under state laws: “No State shall ... deny to any person within its jurisdiction the equal protection of the laws.” By its own terms, the Fourteenth Amendment does *1196 not specify or delineate which classifications will receive particular levels of scrutiny nor does it explain how a particular level of scrutiny will operate in application. This analysis has instead been supplied jurisprudentially by the United States Supreme Court. Generally thereunder, governmental action will receive strict scrutiny if a classification infringes on a fundamental or express constitutional right or if it discriminates on the basis of a “suspect” classification such as race. The law is presumed unconstitutional and will be struck down unless shown to be necessarily related to a compelling state interest. A classification will generally receive intermediate scrutiny if it involves discrimination based on certain classes such as gen-derjuor illegitimacy. To be upheld under this level of review, the classification must be substantially related to a legitimate state interest. The lowest tier of review applies to any other classification and requires the party challenging the law to prove the classification is not rationally related to any legitimate government interest. Devlin, Louisiana Constitutional Law, Developments in the Law, 1989-1990, 51 La.L.Rev. 295, 307 n. 60 (1990).
While state constitutions cannot be interpreted to afford less protection than the federal Constitution because such an interpretation would violate the federal supremacy clause, a state constitutional provision can certainly be intended to afford and construed as affording greater protection than its federal counterpart. Spaht, Lorio, Picou, Samuel & Swaim, The New Forced Heirship Legislation: A Regrettable “Revolution”, 50 La. L.Rev. 409, 420 (1990). Application of this principle was recognized in Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094 (La.1985), where this court held that by adopting the language in Art. I, Sec. 3, the framers of the 1974 Constitution and the voters who ratified it intended to create an equal protection provision which gave greater rights and protection than its federal counterpart. This court explained the meaning and operation of Art. I, Sec. 3 as follows:
Article I, Section 3 commands the courts to decline enforcement of a legislative classification of individuals in three different situations: (1) When the law classifies individuals by race or religious beliefs, it shall be repudiated completely; (2) When the statute classifies persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliations, its enforcement shall be refused unless the state or other advocate of the classification shows that the classification has a reasonable basis; (3) When the law classifies individuals on any other basis, it shall be rejected whenever a member of a disadvantaged class shows that it does not suitably further any appropriate state interest.
Sibley, Id. at 1107.[10]
Both the express language adopted in Art. I, Sec. 3 as well as the proceedings of the 1973 Constitutional Convention support Sibley’s holding that Art. I, Sec. 3 was intended to give the citizens of this state greater equal protection rights than are provided under the Fourteenth Amendment.
When a constitutional provision is clear and unambiguous, and its application does not lead to absurd consequences, it must be applied as written without further interpretation in search of its intent. Succession of Lauga, 624 So.2d 1156, 1165 (La.1993); Aguillard v. Treen, 440 15So.2d 704 (La.1983). The wording of Louisiana’s guarantee of equal protection is clear and unambiguous and must be applied as written. The section on its face absolutely prohibits any state law which discriminates on the basis of race.
Even if resort to the intent behind the provision was necessary to resolve any ambiguity, it is clear, by its very terms, that Art. I, Sec. 3 was intended to give greater equal protection under the laws than that found in the Fourteenth Amendment. The guarantee of equal treatment in the section ultimately adopted by the framers during the 1973 Constitutional Convention and ratified by the people of this state “differs markedly” from *1197 the federal guarantee of equal protection, in terms of both its language and its intent. Devlin, Developments, supra, 51 La.L.Rev. at 306 and 310 (“The unique language of the state guarantee of ‘individual dignity[1] was adopted intentionally by its framers, with the specific purpose of providing expansive protection for equality interests independent of and beyond the protections provided by the federal Constitution.”); Devlin, Louisiana Constitutional Law, Developments in the Law, 1992-1993, 54 La.L.Rev. 683, 716 and at n. 135 (1994) (“[T]he crucial reality is that the state equality guarantee was not written solely to mimic the federal Equal Protection clause. Interpretation of the state provision solely or even primarily by reference to federal precedents is untrue both to the plain language of Section 3 and to the intentions of those who wrote it_ The textual differences between the state and federal provisions are self-evident. It is also clear that the expanded language of § 3 of the Louisiana Declaration of Rights was intended to provide more extensive protection for equality interests than is available under the federal Equal Protection clause.”); Hargrave, supra, Declaration, 35 La.L.Rev. at 6 (Art. I, See. 3 goes “beyond the decisional law construing the Fourteenth Amendment of the United States Constitution.”).
Even though resort to the proceedings and transcripts of the Constitutional Convention is not necessary where the clear language of the provision, when compared to traditional federal equal protection analysis, reveals an obvious intent to depart from federal jurisprudence, a review of the Convention proceedings in any case also supports this conclusion. Most significantly, a proposed amendment which would only state that “[n]o person shall be denied equal protection of the laws”, thereby conforming the state guarantee of equality to the protections of the Fourteenth Amendment, was defeated. State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts, Vol. VI, Aug. 29-30, pp. 1022-30.
_[ir>Although Sibley involved the constitutionality of a law which classified on the basis of physical condition, thereby arguably rendering anything this court said in Sibley having to do with racial classifications dictum, the Sibley court was nevertheless correct in its assessment that when a law classifies individuals on the basis of race, “it shall be repudiated completely.” Under federal equal protection analysis, at the time of the adoption of Art. I, See. 3, and even now, if a law distinguishes between individuals on the basis of race, it will be presumed unconstitutional, but may be upheld if the law is shown to be necessarily related to a compelling state interest, an analysis commonly known as strict scrutiny. On the other hand, Art. I, See. 3 provides that “[n]o law shall discriminate against a person because of race.” By its very terms, it is irrelevant whether there is an arguably compelling state interest which justifies the racially discriminatory law, and once it is determined that a law discriminates against persons on the basis of race, there is no further inquiry. The absolute and mandatory language used in the prohibition against discrimination based on race found in Art. I, Sec. 3 is clear and unambiguous and must be applied as written. Had the framers who drafted the provision and the voters who ratified it intended there be any consideration of legislative intent for a racially discriminatory law by a court when assessing its constitutionality under Art. I, Sec. 3, they could have so provided through the use of language equivalent to or similar to that found in the third sentence of the provision which prohibits only arbitrary, capricious or unreasonable discrimination on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliations. Instead, laws which treated persons differently on the basis of race or religion were forbidden absolutely. See Hargrave, Declaration, supra, 35 La.L.Rev. at 8:
[A]s amended and finally adopted, the provision does not allow the traditional [federal] analysis with respect to race and religion. The second sentence (which uses absolute language) in comparison with the third sentence (which employs the arbitrary, capricious or unreasonable formula) permits no discrimination whatsoever with respect to race or religion....
... [T]he prohibition of discrimination because of race ... was absolute. *1198 See also Jenkins, Declaration of Rights, supra, 21 Loy.L.Rev. at 17 (“The second sentence prohibits all laws which discriminate against persons based on race or religion. These are intended to be not merely ‘suspect’ classifications but prohibited classifications. Their purpose is to make the state blind to both the race and religious beliefs of its citizens.”); Berry, Equal Protection, supra, 49 La. L.Rev. at 906-07 and at 914-15 (“In the drafters’ view, laws | ^classifying on the basis of race ... should be unconstitutional on that basis alone.... Laws that classify on the basis of ‘race ... ’ are banned completely by the individual dignity clause. Accordingly, a court should inquire no further once it determines that a law discriminates on the basis of race or religious beliefs.”).[11] Based on the literal language of the provision, as well as the fact the framers and the voters desired to abandon federal jurisprudence, as evidenced most significantly by the rejection by the delegates of an amendment to conform Art. I, See. 3 to that level of protection provided under the federal constitution, it is clear Sibley was correct in concluding that Art. I, Sec. 3 was intended to provide to the citizens of this state equal protection of the laws above and beyond that protected under the federal Constitution and its interpreting jurisprudence. Therefore, based on the foregoing, we reiterate our holding in Sibley that when a law discriminates against a person by classifying him or her on the basis of race, it shall be repudiated completely, regardless of the justification behind the racial discrimination.
Even though our constitution mandates a different level of scrutiny from that used under the Fourteenth Amendment for classifications based on race, in that there is no scrutiny under Art. I, Sec. 3, but there is strict scrutiny for such classifications under the federal Constitution, the fact remains that under either provision, the guarantees of equal protection, although subject to a different analysis, apply regardless of the race of the party burdened by or benefited under the law. In Adarand Constructors, Inc. v. Pena, — U.S. -, -, 115 S.Ct. 2097, 2111, 132 L.Ed.2d 158 (1995) (citations omitted, quotations omitted, emphasis added), the United States Supreme Court noted federal equal protection law had established three general propositions with respect to governmental racial classifications.
First, skepticism: “ ‘[a]ny preference based on racial or ethnic criteria must necessarily receive a most searching examination,’ ”.... Second, consistency: “the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification,”.... And third, congruence: “[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment,”.... Taken together, these [igthree propositions lead to the conclusion that any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny.
See also City of Richmond v. J.A. Croson Company, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) wherein the Supreme Court applied strict scrutiny to a city plan which denied certain citizens the opportunity to compete for a fixed percentage of public contracts based solely on their race, regardless of the race of persons who profited from the plan. “The standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification.... ‘[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color.’ ” Id. at 493-94, 109 S.Ct. at 722 (in part quoting University of California Re *1199 gents v. Bakke, 438 U.S. 265, 289-90, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978)). Likewise, our constitution’s mandate that there shall be no law which discriminates against a person on the basis of race applies equally to all citizens of this state. Therefore, where a law of this state discriminates on the basis of race, it shall be forbidden completely, regardless of the race of the persons benefited or burdened by the law.[12]
Defendants argue the state has a constitutional duty under the Fourteenth Amendment to engage in race-preference programs to cure the effects of past discrimination; therefore, Art. I, Sec. 3 of the Louisiana Constitution, in order to avoid being “unconstitutional” itself under the Fourteenth Amendment, must be interpreted to allow for such affirmative action programs where they meet the strict scrutiny test applicable under federal equal protection analysis. Our review of the jurisprudence convinces us the United States Supreme Court has never interpreted the | ^Fourteenth Amendment to require discrimination on the basis of race for any reason whatsoever. If the Supreme Court had intended the Fourteenth Amendment to be so interpreted and applied, it had several opportunities to do so in the various affirmative action and set-aside cases it has dealt with in the past. In fact, instead of concluding states have a duty to employ reverse discrimination to remedy past discrimination, the Court imposed the highest level of scrutiny in such cases, holding that not only are such programs not mandated but that they will not even be tolerated unless they survive the rigorous strict scrutiny analysis. Indeed, in Croson, supra, 488 U.S. at 490-92, 109 S.Ct. at 720-21, the Supreme Court pointed out that states do not have a duty to engage in race preference programs but instead have the “authority” to do so, should they so desire, provided this authority be exercised within the constraints of the Fourteenth Amendment. The Croson Court explained, on the other hand, that the United States Congress, unlike a state, “has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment” which “may at times ... include the power to define situations which Congress determined threaten principles of equality and to adopt prophylactic rules to deal with those situations.” Id. Thus, although a state has the authority to participate in race preference programs under the Fourteenth Amendment, that same provision does not mandate that it do so. Consequently, a state constitution which prohibits a state from enacting such programs is not in violation of the Fourteenth Amendment.[13]
*1200 ^Defendants additionally argue this court should interpret La. Const. Art. I, Sec. 3 to allow for racial classifications in the imposition of quotas or set-aside programs because to hold otherwise will require the state to withdraw from federal programs which may condition the state’s receipt of federal funds on, among other things, the state’s use of minority preferences and set-asides in the use of the funds. The absolute and mandatory language used in the prohibition against laws which discriminate on the basis of race found in the constitution does not change simply because the state may stand to lose federal funds if it has to withdraw from participating in voluntary federal programs wherein the distribution of federal funds may be contingent on the state’s violation of its own constitution. The language of the second sentence of Art. I, Sec. 3 does not allow for the consideration of any hypothetical loss of funds any more than it does the remedial intent behind the Act. Should the state find itself in a financial bind because of the restrictions placed on it by the constitution, the legislature of this state can suggest, and the people of this state can vote for, an amendment to the constitution which would allow for the state to participate in such federal programs without the state’s having to violate its own constitution.[14]
12iAppIication to the Act
The Act on its face sets up a system whereby state agencies are mandated to meet “annual goals for participation by certified minority business enterprises.” The goals are to be met under the Act mainly through the use of set-asides and also through preferences in the awarding of public works and procurement contracts. Generally speaking, with regard to the set- *1201 asides, when a contract is designated as a minority set-aside project, only certified minority business enterprises may bid. As explained earlier, only members of certain races can obtain a minority business enterprise designation. Therefore, the set-aside provisions under the Act discriminate against members of those races which cannot obtain a minority business enterprise designation because they cannot bid on the set-aside project. The Act deprives certain citizens of the opportunity to compete for contracts which have been set aside solely on the basis of race, thereby creating an absolutely prohibited racial classification.
Likewise, certain provisions under the Act, most specifically La.R.S. 39:1962, create a system of preferences which generally operate such that although members of all races can bid on the project, a certified minority business will receive the contract if his bid is within five percent of the lowest responsive and responsible bidder provided he agrees to adjust his bid to the amount of the original lowest bid. Preferences such as this also discriminate against non-minority business enterprises. Although they are able to bid on the project, non-minority enterprises who have the second lowest bid are not given the opportunity to match the lowest bid and thereby obtain the contract, although the Act on its face gives this same benefit to minority-owned business enterprises. Therefore, with respect to preferences, the Act on its face treats business enterprises differently solely because of the race of its owners and officers.
In sum, the Act provides to members of certain designated races and excludes from members of non-designated races the opportunity to bid on certain contracts and the opportunity to match the lowest bid made by a non-minority bidder and thereby obtain the contract on certain pother projects. The set-asides and preferences under the Act clearly discriminate against a person on the basis of race, and the Act, to that extent, is unconstitutional under La. Const. Art. I, Sec. 3. Additionally, to the extent the Act requires the Division of Minority and Women’s Business Enterprise to foster and implement the above unconstitutional minority based set-asides and preferences, those portions of the Act are also unconstitutional.
Severability
Having determined the trial court correctly found the Act unconstitutional insofar as it adopts prohibited racial classifications in the application and implementation of its set-aside and preference programs, we must now turn our attention to whether or not the trial court erred in additionally holding the remaining portions of the Act were not severable and were therefore also unconstitutional. The unconstitutionality of one or more portions of a law does not render the entire law unenforceable if the remaining portions are severable from the offending portions. Police Association of New Orleans v. City of New Orleans, 94-1078 at p. 19-21; 649 So.2d 951, 965 (La. 1/17/95). The test for severability is whether the unconstitutional portions of the law are so interrelated and connected with the constitutional parts that they cannot be separated without destroying the intention of the legislative body enacting the law. Police Association, Id.; Polk v. Edwards, 626 So.2d 1128, 1148 (La.1993). To be capable of separate enforcement, the valid portion of an enactment must be independent of the invalid portion and must form a complete act within itself. The law enforced after separation must be reasonable in light of the act as originally drafted. The test is whether the legislature would have passed the statute had it been presented with the invalid features removed. Succession of Lauga, 624 So.2d 1156, 1171-72 (La.1993). Where the purpose of the statute is defeated by the invalidity of part of the act, the entire act is void. Conversely, however, when the general objectives of the act can be achieved without the invalid part, the remaining parts of the act will be upheld. Polk, Id.; Lauga, Id.
It is readily apparent the main intent of the legislature in enacting the Act was to provide for set-asides and preferences which would operate to benefit minority business enterprises up to an amount not to exceed 10% of the total dollar amount spent each year on public works and procurement contracts by state agencies. Although the Act was amended eight years later to *1202 12sprovide this benefit for women’s business enterprises also in a limited amount not to exceed 2% of the agencies’ contracts, we do not believe, given the apparent “afterthought” nature of providing these benefits to women’s businesses in such a limited fashion, that the legislature would have passed the Act solely to benefit women’s businesses.[15] Furthermore, the statutes providing these benefits to women’s business enterprises are completely interrelated, connected, and in fact identical with, the statutes providing for set-asides and preferences for minority business enterprises. The general objective of the Act — to increase participation by minority and women’s business enterprises in state contracting — cannot fully be met under the Act if the set-asides and preferences cannot also be used to benefit minority business enterprises. The Division’s sole purpose for existing is to foster and implement the minority based set-asides and preferences.
Based on the foregoing, we conclude the legislature would not have passed the Act without the presence of the minority business enterprise set-aside and preference features. The unconstitutional portions of the law having to do with these racially based set-asides and preferences are so interrelated with the remaining portions of the Act having to do with women’s business enterprises and the Division of Minority and Women’s Business Enterprise that they cannot be separated without destroying the intent of the legislature in enacting the law. We find the remaining portions of the Act are not severable from the unconstitutional portions; therefore, the entire Act is unconstitutional.[16]
CONCLUSION
In conclusion, we affirm the trial court’s granting of summary judgment, holding that the I^Act creates unconstitutional racial classifications through the use of minority set-asides and preferences, and we affirm the trial court’s conclusion that because the remaining portions of the Act are not severable from the unconstitutional portions, the entire Act must be declared unconstitutional.
AFFIRMED.
JOHNSON, J., dissents and assigns reasons.

Judge Burrell Carter, Jr., First Circuit Court of Appeal, sitting to fill the vacancy created by the resignation of Justice James L. Dermis. Lemmon, J., not on panel. Rule IV, Part 2, § 3.

. See also La.R.S. 39.-1960.A. and 39:1961.

. The constitutionality of the Act with regard to its establishment of preferences and set-asides based on gender is not before us, and in any case, such analysis would be governed by a provision under La. Const. Art. I, Sec. 3 which is different from that which governs racial discrimination.

. The Supreme Court later reaffirmed and reiterated its Hunt test in International Union, et al. v. Brock, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) wherein it pointed out the benefits of *1191 and policy reasons behind allowing associations to bring suits on behalf of its members. First, "an association suing to vindicate the interests of its members can draw upon a pre-existing reservoir of expertise and capital” which may be otherwise unavailable to its individual members. Second, the Court noted "the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others.” Id. at 289-90, 106 S.Ct. at 2533.

. In Hunt and International Union, on the other hand, the Supreme Court found the associations involved had standing to bring the suits. In Hunt, the association which brought the action was charged by law with the duty of promoting the apply industry, it had shown clear, direct economic injury to the members thereof, and no individualized proof would be necessary in order for the courts to grant the relief sought. In International Union, the individual members would have had standing to sue in their own right because a positive outcome of the suit would have affected their future entitlement determinations; second, there was “little question” that the interests of the union in the suit were germane to its purposes; and, third, the nature of the relief sought did not require the participation of individual members of the lawsuit.

. See also Adarand Constructors, Inc. v. Pena, - U.S. -, -, 115 S.Ct. 2097, 2105, 132 L.Ed.2d 158 (1995) (citations omitted):
Adarand need not demonstrate that it has been, or will be, the low bidder on a government contract. The injury in cases of this kind is that a "discriminatory classification prevents the plaintiff from competing on an equal footing.” The aggrieved party “need not allege that he would have obtained the benefit but for the barrier in order to establish standing.”

. Because it is not necessary that there be any particular bid or contract in dispute, the LAGC has an interest in having not only the set-asides but also the preference whereunder minority business enterprises are given a preference in the bidding of certain public works contracts declared unconstitutional. See La.R.S. 39:1962.

. In oral argument to this court, counsel for the LAGC indicated the LAGC had some minority members. This does not detract, however, from the LAGC's interest in insuring the state utilizes a non-discriminatory public bid process, a goal beneficial to all its members.

. See also, e.g., Antieau, Modem Constitutional Law, § 15:19 [If there is a good likelihood that the defendant, who has ceased illegal activity may resume it in the future, the courts will not treat the issue as moot unless it can be shown by the defendant that there is no reasonable expectation that the wrong will be repeated, citing United States Supreme Court cases going back 100 years.].

. The adoption of Art. I, Sec. 3, the Right to Individual Dignity, marked the first time that Louisiana citizens have been guaranteed equal protection of their laws by their state constitution. Jenkins, The Declaration of Rights, 21 Loy. L.Rev. 9, 16 (1975); Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 6 (1974); Berry, Equal Protection — The Louisiana Experience in Departing from Generally Accepted Federal Analysis, 49 La.L.Rev. 903, 904 (1989). Prior to the 1974 Constitution, Louisiana law contained no express guarantee of equal protection, and individuals were protected only by the Fourteenth Amendment.

. This approach was recently reaffirmed in a unanimous decision by this court in Pace v. State of Louisiana, Through Louisiana State Employees Retirement System, 94—1027 (La.1/17/95), 648 So.2d 1302.

. Although resort to the transcripts is unnecessary due to the clear language of the section's prohibition of racial discrimination, we note that when the version of Section 3 which was ultimately adopted was presented to the convention, one of its authors stated in explanation:
Mr. Dennery: “The authors (of the adopted version of Sec. 3) believe that there is absolutely no basis for any discrimination of any sort on the basis of, on account of race or religion." State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts, Vol. VI, Aug. 30, 1973, p. 1029.

. For the foregoing reasons, defendants' argument that Art. I, Sec. 3 should be interpreted to allow for this set-aside program because the provision was intended to prohibit discrimination and not attempts to eliminate discrimination is invalid. Art. I, Sec. 3 is implicated when there is "discrimination against” a person on the basis of race. Although defendants assert the instant Act does not discriminate against anyone but only discriminates in favor of certain races to remedy past discrimination, discrimination in favor of one race is necessarily discrimination against members of another race, and this is what is prohibited under the Article. Since the prohibition against racial discrimination is absolute, it does not allow for any consideration of legislative intent, however noble, in assessing the validity of such a discriminatory law.
Likewise, defendants’ argument that Art. I, Sec. 3 was intended to allow for race-conscious affirmative action programs because it was drafted during a time when affirmative action programs were being implemented across the country is belied by the clear language of the provision itself. Furthermore, the Framers and citizens of this state apparently believed they were in fact insuring the evils of past discrimination would not recur by providing that there can never be any discrimination against minorities on the basis of race under the laws of this state, a protection minorities do not have under the strict scrutiny of federal equal protection analysis.

. This was recognized in Associated General Contractors of California v. San Francisco Unified School District, 616 F.2d 1381 (9th Cir.), cert. denied, 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980). In that case, involving the constitutionality under the Fourteenth Amendment of a construction contract minority set aside program adopted by a school district, the Ninth Circuit Court of Appeals distinguished between “reshuffle” programs and "stacked deck” programs. The Ninth Circuit found states had an affirmative constitutional duty to use “reshuffle” programs to cure the effects of past or present de jure segregation. “Reshuffle” programs were described as programs "in which the state neither gives to nor withholds from anyone any benefits because of that person's group status, but rather ensures that everyone in every group enjoys the same rights in the same place.” 616 F.2d at 1386. On the other hand, the Ninth Circuit *1200 pointed out there is no constitutional duty on a state to engage in " 'stacked deck’ affirmative action” programs. "Stacked deck” programs were described as programs "in which the state specifically favors members of minorities in the competition with members of the majority for benefits that the state can give to some citizens but not to all.” Id. The Ninth Circuit then explained that neither the Fourteenth Amendment nor the United States Supreme Court had ever placed a duty to engage in “stacked deck” programs on the states.
No authority impels us to find a constitutional duty to take "stacked deck" affirmative action. If the Supreme Court believed that such a duty existed, it surely would have said so in Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). On the contrary, even the Bakke dissenters admitted that a school “is generally free, as far as the Constitution is concerned, to abjure granting any racial preferences in its admissions program.” Similarly, we think it significant that in all cases in recent years where the permissibility of “stacked deck” programs was sharply attacked, no court has ventured to still all the controversy by proclaiming that not only is such affirmative action permitted, it is actually required by the Constitution.
There is no doubt that the enactors of the Fourteenth Amendment did not intend it to require “stacked deck” affirmative action programs. Moreover, it is difficult to understand how the literal guarantee that “No State shall ... deny to any person within its jurisdiction the equal protection of the laws” could require a state to disadvantage one citizen and aid another in their competition for a scarce benefit....
Therefore, because no precedent suggests that the Fourteenth Amendment creates a duty to engage in "stacked deck” affirmative action, and no valid reason appears for discovering within the Amendment such a duty, we hold that no such constitutional duty exists.
616 F.2d at 1387-88 (citation omitted).

. Defendants specifically point to the federal highway program which provides federal funds to the state for highway construction as an example of a voluntary federal program under which &e state will no longer be able to obtain federal funds because it will hereinafter be precluded from using a minority set-aside program and will therefore be required to withdraw from the program. However, although this particular financial assistance program encourages the employment of minority businesses in the distribution of its funds, the actual use of “minority business enterprise set asides" is only mandated where otherwise "not prohibited by state or local law.” 49 C.F.R. § 23.45(k). As such, the state’s inability under La. Const. Art. I, Sec. 3 to employ minority set-aside programs in its distribution of the federal highway funds does not automatically require that it voluntarily withdraw from participation in such a program.
Our decision that there is no room, under Art. I, Sec. 3's absolute ban of racial discrimination, for any consideration of a potential and hypothetical loss of federal funds, does not necessitate that this court today decide or predict a federal court’s decision as to whether a federal funds program which mandates both state participation and the use of set-asides would preempt this state’s constitution under the federal Supremacy Clause.

. In fact, the preferences by their own terms do not even apply to or benefit women's business enterprises under the Act.

. Of course, our holding that the women’s set-asides are not severable from the unconstitutional minority set-asides and preferences does not mean that such a provision is or would be unconstitutional should the legislature decide to reenact it, only that it is so interrelated with the unconstitutional portions of the Act that it must also fall. Indeed, we note that a review of the constitutionality of a women's business enterprise set-aside provision would fall under a different level of scrutiny under La.Const. Art. I, Sec. 3, due to the fact that Art. I, Sec. 3 gives less protection to classifications based on gender than it does to those based on race. Rather than providing an absolute ban on discrimination as it does for race, Art. I, Sec. 3 prohibits gender discrimination only if it is arbitraiy, capricious or unreasonable.

. See, Gerald S. Janoff, Comment, Adarand Constructors, Inc. v. Pena: The Supreme Court to Decide the Fate of Affirmative Action, 69 Tulane L.Rev. 997, 1003 (1995).